**UNITED STATES of America**

v.

**Louis J. KAHN.**

**Crim. No. 90–004–N.**

United States District Court,
M.D. Alabama, N.D.

March 23, 1992.

James Eldon Wilson, U.S. Atty., Kent B. Brunson, Asst. U.S. Atty., for U.S.

David Schoen, Montgomery, Ala., for Kahn.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Previously in this criminal case, defendant Louis J. Kahn was convicted and sentenced under 18 U.S.C.A. § 751(a) for escaping from a federal prison camp. Several months after imposition of the sentence, the United States Sentencing Commission amended the provision of the Sentencing Guidelines under which Kahn's sentence was calculated. The cause is again before the court on a motion filed by Kahn requesting that the court modify his sentence

to extend to him the benefits of the Guideline change. For the reasons given below, the court will deny the motion.

## I. BACKGROUND

Prior to his escape, Kahn had been incarcerated at the Maxwell Federal Prison Camp in Montgomery, Alabama. He worked during the day, without supervision by prison personnel, among civilian and military co-workers in an office located away from the prison camp. In December 1989, he failed to return to the prison camp at the end of his work day.

On June 27, 1990, the court sentenced Kahn to 14 months in prison. His sentence was calculated as follows. At the time of sentencing, § 2P1.1(a)(1) of the Guidelines Manual specified a base-offense level of 13 for escape from a federal penal institution. U.S.S.G. § 2P1.1(a)(1) (1990). Upon motion of the government, the court reduced Kahn's offense level by six points because of his substantial assistance to the United States in another investigation. The resulting offense level of seven was combined with a criminal-history category of V, producing a sentencing range of 12–18 months.

Effective November 1, 1990, § 2P1.1 of the Guidelines was amended by the addition of a new section, § 2P1.1(b)(3).[1] This section provides in relevant part for a four-level reduction "If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, 'halfway house,' or similar facility." U.S.S.G. § 2P1.1(b)(3) (1991). With his motion, Kahn argues that he should now receive this reduction. If his offense level were further reduced by four, according to Kahn, his resulting offense level of three, when combined with his criminal-history category of V, would produce a sentencing range of 2–8 months. He rests his motion on 18 U.S.C.A. § 3582(c)(2), which provides that district courts have discretionary authority to reduce a sentence when the Sentencing Commission amends a relevant sentencing provision.[2]

## II. DISCUSSION

### A.

■ The first issue presented to the court is whether the new § 2P1.1(b)(3) applies to Kahn's circumstances. Kahn argues that once a court determines that a prisoner has escaped from custody which is

---

**1.** As amended, § 2P1.1 now reads as follows:

"Escape, Instigating or Assisting Escape
(a) Base Offense Level:
(1) 13, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense;
(2) 8, Otherwise.
(b) Specific Offense Characteristics:
(1) If the use or the threat of force against any person was involved, increase by 5 levels.
(2) If the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours, decrease the offense level under § 2P1.1(a)(1) by 7 levels or the offense level under § 2P1.1(a)(2) by 4 levels. *Provided,* however, that this reduction shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more.
(3) If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house," or similar facility, and subsection (b)(2) is not applicable, decrease the offense level under subsection (a)(1) by 4 levels. *Provided,* however, that this reduction shall not apply if the defendant, while away from the

facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more.
(4) If the defendant was a law enforcement or correctional officer or an employee of the Department of Justice, at the time of the offense, increase by 2 levels."
U.S.S.G. § 2P1.1 (1991).

**2.** Section 3582(c)(2) provides that:

"[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C.A. § 994(*o*), upon motion of the defendant ... the court may reduce the term of imprisonment after considering the factors set forth in § 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."
18 U.S.C.A. § 3582(c)(2). Under the Sentencing Guidelines, § 2P1.1(b)(3), which bears amendment number 341, is amenable to retroactive application. Guidelines Manual § 1B1.10, *Retroactivity of Amended Guideline Range* (Policy Statement) (1991).

"non-secure" the inquiry is at an end and the provision must be applied. Non-secure custody is defined in application note 1 to § 2P1.1 as

> "custody with no significant physical restraint (e.g., where a defendant walked away from a work detail outside the security perimeter of an institution; where a defendant failed to return to any institution from a pass or unescorted furlough; or where a defendant escaped from an institution with no physical perimeter barrier)."

U.S.S.G. § 2P1.1, comment, n. 1. There is no dispute that Kahn was in "non-secure custody" as defined by the application note: he walked away from a work detail outside the security perimeter of Maxwell Federal Prison Camp. *See also United States v. Birchfield,* 709 F.Supp. 1064 (M.D.Ala. 1989).

The court agrees with the United States Probation Department, however, that § 2P1.1(b)(3) does not apply to Kahn's circumstances.[3] The plain language of § 2P1.1(b)(3) provides that, for the reduction to apply, an escape must be not only from "non-secure custody" but also from a specific type of institution: "a community corrections center, community treatment center, 'halfway house,' or similar facility." The court cannot ignore this plain language and plain meaning. Absent some exceptional circumstance, the plain language of a rule or regulation should be followed. *Ardestani v. I.N.S.,* — U.S. —, —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991); *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988); *cf. Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (Guidelines construed according to the "plain language of the Guidelines Manual"). Such a circumstance is not present here.

Indeed, to ignore this specific-institution language would further violate "the elementary canon of construction that a stat-

ute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). It is the duty of the court "to save and not to destroy," *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955), "to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section." *Id.* (internal quotations and citations omitted). *See also Kungys v. United States,* 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988) (Scalia, J., joined by Rehnquist, C.J., and Brennan, J.) ("the cardinal rule of statutory interpretation [is] that no provision should be construed to be entirely redundant"). As the Eleventh Circuit Court of Appeals has concluded,

> "a court should interpret a statute so as to give effect to each of its provisions. Any interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided."

*United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1502 (11th Cir.1991) (internal quotation marks and citations omitted).

This conclusion finds further support in the familiar principle that "specific words within a statute ... may not be read in isolation of the remainder of that section or of the entire statutory scheme." *Sutton v. United States,* 819 F.2d 1289, 1293 (5th Cir.1987). *See also United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984) ("we do not ... construe statutory phrases in isolation; we read statutes as a whole"). When § 2P1.1(b)(3) is construed in the context of other, related provisions of the Guidelines, it is clear that the specific-institution language imposes an additional requirement which must be met before the provision may be applied. Section 2P1.1*(b)(2),* like § 2P1.1*(b)(3),* applies to escapes. Subsection (b)(2) provides for a sentence reduction "If the defendant escaped from *non-secure*

---

**3.** The Probation Department bases its position on a legal opinion obtained from counsel for the United States Sentencing Commission. Because the court is convinced from its own reading of the Guidelines Manual that § 2P1.1(b)(3) does not apply to Kahn, the court need not reach the issue of whether the legal opinion of the Sentencing Commission's counsel interpreting the Commission regulations is entitled to any deference.

*custody* and returned voluntarily within ninety-six hours." (Emphasis added.) [4] However, unlike subsection (b)(3), subsection (b)(2) does not also require that the defendant have resided in any particular type of facility. Subsection (b)(2) therefore applies to non-secure custody in general, whereas subsection (b)(3) applies to non-secure custody in specific institutions only. It would be illogical to read the two subsections as if they contained the same language when they do not.

Section 2J1.6(b)(1), which covers failure-to-appear offenses, presents somewhat the converse scenario. The section provides for a reduction "If . . . the defendant: (A) voluntarily surrendered within 96 hours of the time he was originally scheduled to report . . . ; or (B) was ordered to report to a *community corrections center, community treatment center, 'halfway house,' or similar facility*, and subdivision (A) does not apply. . . ." (Emphasis added.) This provision, which was added to the Guidelines Manual contemporaneously with subsection (b)(3) to § 2P1.1, uses the same specific-institution language used in subsection (b)(3), but notably without reference to non-secure custody. The specific-institution language therefore has independent

and significant meaning by itself and is not mere surplusage.

In conclusion, to receive the four-point reduction under § 2P1.1(b)(3), a defendant must demonstrate that, first, he was in "non-secure custody," *and,* second, he escaped from a community corrections center, community treatment center, "halfway house," or a facility which is similar to these three.[5]

### B.

Kahn argues that, if the court concludes that the specific-institution language applies, he is still entitled to the reduction because he escaped from a "similar facility" as that term is used in § 2P1.1(b)(3). He contends that federal prison camps in general, and the Maxwell Federal Prison Camp in particular, are facilities "similar" to "community corrections centers" within the meaning of this section. The court again agrees with the Probation Department and rejects his argument.

### 1.

Kahn attempts to draw a number of similarities between prison camps and community corrections centers. First, both prison camps and community corrections centers are run by wardens and regulated by the

---

4. *See* note 1, *supra.*

5. Kahn relies on four district court cases which, admittedly, support his position. *See U.S. v. Agudelo,* 768 F.Supp. 339 (N.D.Fla.1991); *U.S. v. Crosby,* 762 F.Supp. 658 (W.D.Pa.1991); *U.S. v. Albury,* CR. NO. TCR 88–04006–01 (N.D.Fla. Jan. 28, 1991); *U.S. v. Norman,* CR. NO. TCR 89–04022–WS (N.D.Fla. Oct. 10, 1991). After reviewing these decisions, however, this court is not convinced that the district courts have properly interpreted the critical language of subsection (b)(3). In *Agudelo, Crosby,* and *Albury,* the courts do not explain why an inquiry was not conducted to determine whether the facility in question was "similar" to those listed in § 2P1.1(b)(3). The courts simply found that the defendants were in "non-secure custody" and then granted relief. In *Norman,* the court rejected the notion that subsection (b)(3) requires the defendant to satisfy both the "non-secure custody" and specific-institution requirement, with the following comment:

"[T]he commentary of Application Note 1 Section 2P1.1 clarifies that non-secure custody means custody with no significant physical

restraint, such as where a defendant walks away from a work detail outside the security perimeter of an institution, and does not identify residence in a halfway house as a criteria for this reduction to apply."

Slip op. at 2. The *Norman* court, therefore, concludes that, because the satisfaction of the "non-secure custody" requirement does not depend upon residence in one of the listed specific institutions," subsection (b)(3) also does not depend on a defendant's residence in one of the listed specific institutions. This court cannot agree with that reasoning. First, Application Note 1 seeks to define only the term "non-secure custody." It would therefore be illogical to expect to find a reference to specific institutions within the definition. Second, the note accompanied § 2P1.1(b) before subsection (b)(3) was added. The note therefore addressed only the language in subsection (b)(2), which, unlike subsection (b)(3), does not refer to a particular type of facility. When § 2P1.1 was amended to add subsection (b)(3), regrettably no definition of "community corrections centers, community treatment centers, 'halfway houses' and similar facilities" was also added to the comment which attends the section.

Bureau of Prisons. *See* 28 C.F.R. § 500.- 1(a), (d) (1991). Second, the Bureau of Prisons categorizes escapes into two levels of severity: the first being escapes from escort, a secure institution, or a non-secure institution using violence, which are considered prohibited acts of the "greatest severity;" and the second being escapes without violence from an unescorted community program, a non-secure institution, or from outside a secure institution, which are considered acts of "high severity." 28 C.F.R. § 541.13 (1991). Thus, under the regulations, an escape from a prison camp would be disciplined similarly to an escape from a community corrections center. Finally, inmates from both federal prison camps and community corrections centers are automatically awarded "extra good time" throughout their assignments there. 28 C.F.R. §§ 523.13, 523.15.

Nevertheless, the court must conclude that prison camps and community corrections centers are not sufficiently alike to be considered "similar" within the meaning of § 2P1.1(b)(3). First, because community corrections centers are "community based programs," *see, e.g.*, 28 C.F.R. §§ 524.41(d), 549.16(c) (1991), residence in such facilities is "community confinement," whereas federal prison camp incarceration is not. U.S.S.G. § 5F1.1, comment, n. 1. Second, community-corrections-center confinement is used as intermediate punishment imposed as a condition of probation or supervised release, U.S.S.G. § 5C1.1(e)(2), § 5F1.1, as punishment for offenders serving short sentences of imprisonment, or as a transitional service for those nearing release. U.S. Department of Justice, Federal Bureau of Prisons, *A Judicial Guide to the Bureau of Prisons* 6 (1991). Confinement in federal prison camps is institutional confinement, albeit under minimum security. *Id.* at 8–9. Although some intermediate-punishment programs are based in

camps, assignment to a camp is not typically considered to be intermediate punishment. *Id.* Finally, the Prison Bureau's definition of "release" in some contexts includes an inmate's "transfer to a community corrections center." An inmate's transfer to a federal prison camp does not appear to be included in this definition. 28 C.F.R. §§ 301.102, 551.151 (1991).[6]

2.

But more importantly, a common-sense approach to § 2P1.1(b)(3) dictates a conclusion that it does not cover prison camps. Facilities known as "federal prison camps" have been a staple within the prison system for over 60 years. If the Sentencing Commission had intended that they should be included within the reach of § 2P1.1(b)(3) the Commission would certainly have expressly mentioned them. The court cannot believe that omission was merely an oversight. The court is instead convinced that the Commission included the "similar facility" language as a catch-all phrase, intended to reach facilities which are similar to community corrections centers, community treatment centers, and halfway houses but which have, or may, come to be known under a different nomenclature. The Commission recognized, first, that it may have overlooked a similar facility known by a different name, and, second, that the names of these facilities might change over time while their basic missions might not. For example, it appears that most references in the Bureau of Prison regulations to "community treatment center" have been replaced by the term "community corrections center" and references to "halfway houses" no longer remain. *See e.g.*, 55 Fed.Reg. 49976 (1990); 55 Fed.Reg. 38006 (1990); 55 Fed.Reg. 6178 (1990). These facilities would continue to fall within the reach of § 2P1.1(b)(3) irrespective of their

6. Kahn makes another argument which, although interesting, still has no merit. He argues that his escape was not from a prison camp but rather from a "work detail" away from a prison camp. He argues that a work detail meets the requirements of § 2P1.1(b)(3). Kahn overlooks, however, that the focus of § 2P1.1(b)(3) is on from whose "custody" the

defendant escaped. The section provides for a reduction "If the defendant escaped from the non-secure *custody* of a community corrections center, community treatment center, "halfway house," or similar facility." (Emphasis added.) Here, although Kahn may have been on a work detail at the time of his offense, he escaped from the "custody" of a prison camp.

nomenclature.[7]

### C.

 Finally, the court agrees with the United States Attorney that, even if § 2P1.1(b)(3) applied fully to Kahn, the court should still decline to change his sentence. The court is convinced that, if Kahn were re-sentenced today with a four-level reduction pursuant to § 2P1.1(b)(3), he would still receive a sentence of 14 months. In response to the government's motion for a downward departure based on Kahn's cooperation, the court would simply depart downward only two levels. The sentence Kahn initially received was appropriate, and it still remains appropriate today.

Accordingly, for the above reasons, it is ORDERED that defendant Louis Jay Kahn's motion for modification of sentence, filed on November 4, 1991, be and it is hereby denied.

DONE.

---

7. In reaching the conclusions it does today, the court must advance one caveat. The court invited the parties to gather and present evidence regarding the similarities between prison camps and community corrections centers. The parties declined the invitation for an evidentiary hearing. The record is therefore sparse as to how community corrections centers and prison camps are administered, what their purposes are, and how they differ from traditional penal institutions. The court is concerned that it may have resolved some of the issues without the necessary full factual development.