IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

S)))))))))))))))Q
No. 92-7236
Summary Calendar
S))))))))))))))Q

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THOMAS LOWELL SHAW,

Defendant-Appellant.

S))))))))))))))))))))))))Q
Appeal from the United States District Court for the
Southern District of Texas
S))))))))))))))))))))))))Q
(November 25, 1992)

Before GARWOOD, JONES and EMILIO M. GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Thomas Lowell Shaw (Shaw) was convicted, on his plea of guilty, of unlawful escape from custody in the Federal Prison Camp at Three Rivers, Texas, on May 19, 1991, contrary to 18 U.S.C. § 751(a). He was sentenced to twenty-six months' imprisonment, followed by two years' supervised release, and a fifty dollar special assessment. Shaw now brings this appeal challenging only his sentence. Finding no reversible error, we affirm.

**Facts and Proceedings Below**

In August 1990, Shaw was convicted on two counts of an indictment charging possession of a firearm by a convicted felon contrary to 18 U.S.C. § 922(g)(1) and falsely representing a number to be a social security account number contrary to 42 U.S.C. § 408(g)(2). On November 20, 1990, he was sentenced for these offenses to consecutive terms of imprisonment of five months (firearms count) and three years (social security number count). To commence service of this sentence as directed by the Attorney General, Shaw reported to the Federal Prison Camp at Three Rivers, Texas, on January 14, 1991. He continued serving his sentence at the Federal Prison Camp at Three Rivers until May 19, 1991, when he was discovered missing. He had not been given permission to be absent from the camp. On October 18, 1991, Shaw was apprehended by United States Marshals near Houston. He was subsequently indicted for, and pleaded guilty to, escape from custody contrary to 18 U.S.C. § 751(a).

At his initial sentencing hearing on February 18, 1992, Shaw objected for the first time to the pre-sentence report for not assessing a four-level downward reduction under U.S.S.G. § 2P1.1(b)(3), for escape from the non-secure custody of a correction center, community center, "halfway house," or similar facility.[1]

---

[1] This section provides in pertinent part that "[i]f the defendant escaped from the non-secure custody of a community corrections center, community treatment center, 'halfway house,' or similar facility . . . decrease the offense level under (a)(1) by 4 levels . . . ." U.S.S.G. § 2P1.1(b)(3). Section 2P1.1(a)(1) requires a base offense level of 13 for escape if "custody or confinement is by virtue of . . . conviction of any

He argued that the only requirement under section 2P1.1(b)(3) was that his incarceration was in "non-secure custody," as demonstrated by the fact that he had effected his escape from the camp without having to cross a fence or any other type of barrier. The district court adjourned the hearing in order to give the government the opportunity to produce witnesses who could describe the characteristics of the Three Rivers camp.

On March 9 and March 23, 1992, the district court conducted second and third sentencing hearings at which it received testimony concerning the Three Rivers correctional institution. The testimony described the institution as being eight miles outside of the city of Three Rivers, and as being composed of a medium and a minimum security facility. The minimum security facility was referred to as the camp. The Three Rivers camp is classified as a satellite camp, as opposed to an independent camp, because it is physically located within the same compound as the prison facility. The medium security facility is surrounded by two perimeter fences, and although no immediate fence surrounds the camp, a barbed-wire fence does encircle the 37-acre perimeter of the entire institution.

The only two entrances to the property are driveways; to leave the property by any other means, one would have to cross the barbed-wire fence. This fence was not erected or maintained to detain prisoners but rather as a boundary marker and to keep livestock out. Every new inmate is given verbal and written

offense." U.S.S.G. § 2P1.1(a)(1).

3

instructions on what constitutes "out of bounds" at the camp, and is warned that violations of the boundaries result in incident reports and corresponding sanctions.

The district court also received testimony concerning the attributes of institutions described in section 2P1.1(b)(3). These institutions, such as a community center or a half-way house, allow an inmate at "mid-point" to readjust to the community setting, and they represent the lowest custody level within the system. Generally, an individual moves from a prison camp to one of these institutions as he draws nearer to his release date, although an individual could be placed in such a facility from the outset. Most inmates are sent to such a facility within the last six months of their incarceration, while an inmate could be imprisoned up to eight years in a prison camp.

A major difference between the community center type facilities and a prison camp is that the convicted individual is actually confined in the camp. At the community center, the individual returns to the center each evening, after participating all day as a member of the community work force. Members of the community centers may come and go as they please; inmates of the Three Rivers prison camp must have permission before they may leave the camp. Furthermore, at the Three Rivers camp, the prisoners are counted at least five times a day, six on weekends. Furthermore, on camp regular work detail or in the camp's community custody program where inmates work in the community, the inmates are visually accounted for at least every two hours. Camp inmates are

never allowed unauthorized visitors.  Visiting hours are strictly enforced with only a certain number of visits allowed per month.

In these ways, the prison camp separates the inmate from the community and restricts his contact with people on the "outside." By contrast, at community centers individuals merely sign in and out.  The center residents maintain contact with the community because the principal purpose is reintegration.  Extensive community contact is encouraged since not only must the individual readjust to society, but he must also pay for his medical care and subsistence while staying at the center, as well as turn over a portion of his gross earnings to the facility to help offset its expenses.  Community centers are generally not operated by the federal government.  The federal governmentSQthe Bureau of PrisonsSQoperates the prison camp and bears the full cost for incarceration there.

The district court ruled that in order to qualify under section 2P1.1(b)(3), the defendant must not only show that he escaped from a non-secure facility but that the facility was similar to the institutions described in section 2P1.1(b)(3).  The court found that the Federal Prison Camp at Three Rivers was not a facility similar to those listed in section 2P1.1(b)(3).  The district court accordingly denied Shaw's request for a downward adjustment in his offense level under section 2P1.1(b)(3).  The court then calculated Shaw's offense level as eleven,[2] and his

---

[2] Shaw's base offense level was calculated as thirteen under section 2P1.1(a)(1); the offense level was reduced to eleven by a two-level reduction for acceptance of responsibility.  Section

5

criminal history category as five, resulting in a guideline range of twenty-four to thirty months. The district court sentenced Shaw to twenty-six months' incarceration. Shaw now appeals the district court's denial of a 2P1.1(b)(3) downward adjustment to his offense level.

## Discussion

Shaw contends that the district court in determining whether the camp was similar to the facilities mentioned in section 2P1.1(b)(3) erred by considering factors other than whether the camp was similar in that its custody of Shaw was non-secure. Shaw cites the application notes to guideline 2P1.1, which define non-secure custody as "custody with no significant physical restraint." U.S.S.G. § 2P1.1, comment. (n.1). Shaw argues that this definition should be the only similarity considered. Under this framework, Shaw argues that he squarely fits within the application note definition because it gives as an example of "non-secure custody" the situation "where a defendant walked away from a work detail outside the security perimeter of an institution." *Id*. Shaw argues that escape by walking away from a federal prison camp mirrors this example.[3]

---

3E1.1.

[3] Shaw also seems to argue that federal prison camps might be similar to community centers in other aspects besides "non-secure custody." However, at sentencing he in essence admitted that a prison camp was not similar to a community center and that the institutions had different purposes. The district court acknowledged his concession.

The district court's determination whether the facilities were similar was a factual determination because it required the court to draw conclusions from the evidence presented at the

We agree that one element for awarding an adjustment under section 2P1.1(b)(3) is a showing that the defendant escaped from "non-secure custody."[4]   However, this is not the only element. Shaw cites one case that squarely addresses this issue and concludes that the sole requirement for section 2P1.1(b)(3) is that the facility's custody is "non-secure." *United States v. Agudelo*, 768 F.Supp. 339 (N.D. Fla. 1991).  The *Agudelo* court determined that a defendant who had walked away from Eglin Federal Prison Camp at Eglin Air Force Base, Florida, had done so from a "non-secure custody" facility.  *Id.*  Based only on this finding, the court granted a section 2P1.1(b)(3) reduction.  The *Agudelo* court does not consider if this section might require additional findings and does not explain why "non-secure custody" is the only element to be considered.  We decline to follow the *Agudelo* court's analysis because it simply ignores the rest of section 2P1.1(b)(3), which is concerned with "*the* non-secure custody *of* a community corrections center, community treatment center, 'halfway house,' or *similar*

_____

sentencing hearing.  *United States v. Mejia-Orosco*, 867 F.2d 216, 220 (5th Cir. 1989) (holding that a district court's finding was factual because it required the court to "draw an inference from a variety of data").  Since Shaw did not challenge the district court's factual determination at the sentencing hearings, his argument is waived.  *United States v. Smallwood*, 920 F.2d 1231, 1238 (5th Cir. 1991) (holding that "a fact matter must be the subject of an objection at the time of sentencing if it is to be an issue on appeal").  In any event, the evidence amply supportsSQand indeed compelsSQthe district court's finding.

[4]     We observe that section 2P1.1(b)(2) provides (with a limited exception) for reduction of base offense level "[i]f the defendant escaped from non-secure custody and returned voluntarily within 96 hours."  Shaw did not return voluntarily or within 96 hours, and does not claim entitlement to a section 2P1.1(b)(2) reduction.

7

*facility*."[5]

As pointed out in *United States v. Brownlee*, 970 F.2d 764 (10th Cir. 1992), Shaw's argument must be rejected because it,

> "ignores the plain language of U.S.S.G. §2P1.1(b) which dictates that two circumstances must be present before an escapee receives the four-level reduction: first, the escape must be from non-secure custody, and, second, the non-secure custody must be provided by a particular type of facility, i.e., a community corrections center, community treatment center, halfway house or similar facility." *Id.* at 765.

To give the language of section 2P1.1(b)(3) any other interpretation "would render the limiting modifiers of this subsection meaningless." *United States v. McGann*, 960 F.2d 846, 847 (9th Cir. 1992). The *McGann* court compared section 2P1.1(b)(3) with section 2P1.1(b)(2), which does not have any modifying language to the words "non-secure custody."[6] As explained in *McGann*, "When the Guidelines apply broadly to cover escapes from all types of non-secure custody, the language of the provision states so explicitly." *Id.* We agree. As noted by the *Brownlee* court, "prison camps were recognized institutions in the corrections system long before the enactment of the sentencing guidelines and, had the Sentencing Commission intended that prison

---

[5] One other district court also held that a federal prison camp was a non-secure facility and that this factor would allow a section 2P1.1(b)(3) sentence reduction. *United States v. Crosby*, 762 F. Supp. 658 (W.D. Pa. 1991). However, that case was concerned with whether section 2P1.1(b)(3) could be applied retroactively, and, as Shaw admits in his brief, the issue *sub judice* was not raised by any party but was merely assumed. *Id.* at 659.

[6] See note 4 *supra*.

8

camps be within the purview of §2P1.1(b)(3), it could have included them specifically." *Brownlee*, 970 F.2d at 765. We hold that in awarding a downward adjustment under section 2P1.1(b)(3), the district court must find not only that the defendant escaped from non-secure custody, but also that the facility escaped from either is, or is a facility similar to, a community corrections center, community treatment center, or halfway house.

The evidence from the sentencing hearings amply supports SQindeed compelsSQthe district court's finding that a federal prison camp is not a facility similar to a community corrections center, community treatment center, or halfway house. As noted in *Brownlee*, "The facilities listed in [2P1.1(b)(3)] are all integrated into the community. A prison camp, even though there may be no perimeter barriers and residents may have some freedom to come and go, is an environment separated from the community." *Id.* We would also add that the federal prison camp's purpose is to incarcerate the inmate while the community center's purpose is to bring the inmate back into society. The district court did not err in refusing to reduce Shaw's sentence under section 2P1.1(b)(3). Although Shaw may have escaped from non-secure custody, he did not escape from a facility similar to a community corrections center, community treatment center, or halfway house.

### Conclusion

Shaw has failed to demonstrate any error in his sentence, and it is accordingly

9

AFFIRMED.