**UNITED STATES of America**

v.

**Carl HILLSTROM, Appellant.**

No. 92–7237.

United States Court of Appeals,
Third Circuit.

Argued Nov. 6, 1992.

Decided March 12, 1993.

view on this question, leaving it to the district   court.

James V. Wade, Federal Public Defender, D. Toni Byrd (Argued), Asst. Federal Public Defender, Williamsport, PA, for appellant.

James J. West, U.S. Atty., Barbara Kosik Whitaker (Argued), Asst. U.S. Atty., Scranton, PA, for appellee.

Before: BECKER, STAPLETON, Circuit Judges and LAY, Senior Circuit Judge *.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Defendant-appellant Carl Hillstrom was convicted of escape from federal custody, 18 U.S.C. § 751. Under the Sentencing Guidelines, the base offense level for escape is thirteen. *See* U.S.S.G. § 2P1.1(a)(2). However, under § 2P1.1(b)(3) of the Guidelines, a defendant is entitled to a four-point reduction in the base offense level portion of the grid if he or she "escaped from the non-secure custody of a community corrections center, community treatment center, 'halfway house,' or similar facility." U.S.S.G. § 2P1.1(b)(3). There is no dispute that Hillstrom's escape from Allenwood Federal Prison Camp was from non-secure custody as defined by the Guidelines. *See* U.S.S.G. § 2P1.1, comment (n. 1). The issue on appeal turns on whether Allenwood is a facility similar to a community corrections center ("CCC"), community treatment center ("CTC"), or halfway house. The district court found that it was not. Because we believe that the court based its decision on an incomplete description of the nature of community correction centers and an inadequate consideration of what we take to be one of the primary policy justifications behind the adoption of the current version of

§ 2P1.1(b)(3), we will vacate the district court's order and remand for further proceedings.

## I.

Hillstrom was incarcerated at Allenwood as a result of his conviction for the importation of marijuana in violation of 21 U.S.C. § 952. On October 10, 1990, while in the midst of serving his 62 month prison sentence, Hillstrom was assigned the task of mowing the fields outside the camp. He was completely unsupervised and did not return at the end of the day, having walked away from his work detail and from Allenwood. Later, the prison authorities found his tractor abandoned in nearby woods. It was not until November 21, 1991 that the U.S. Customs Service caught Hillstrom while he was re-entering the United States from Canada. Allenwood is a Level One, minimum security prison under Federal Bureau of Prisons' standards, *see* U.S. Dep't of Justice, Federal Bureau of Prisons, Facilities 11 (1992), and both parties agree that it is a "non-secure" facility as defined by § 2P1.1 of the Sentencing Guidelines.

In its entirety, § 2P1.1(b)(3) states:

If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house," or similar facility, and subsection (b)(2) is not applicable, decrease the offense level under subsection (a)(1) by 4 levels or the offense level under subsection (a)(2) by 2 levels. *Provided,* however, that this reduction shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more.

In addition Application Note 1 states: "Non-secure custody" means custody with no significant physical restraint (*e.g.,* where a defendant walked away from a work detail outside the security perimeter of an institution; where a defendant failed to return to any institution

*The Honorable Donald P. Lay, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

from a pass or unescorted furlough; or where a defendant escaped from an institution with no physical perimeter barrier).

Allenwood has no significant physical barriers, only a "dilapidated chain-link fence as a physical perimeter barrier." App. at 72 (citing *United States v. Cordero*, unpublished order, filed May 24, 1991 (Muir, J.)). Accordingly, an Allenwood inmate could, apparently, have departed the institution from his dormitory as easily as from the work detail. Allenwood is unpatrolled during the work day—from 7:30 a.m. until 4:00 p.m.—and patrolled during the remainder of the day and night. Similarly, although there are four daily counts of the Allenwood prisoners (at 3:00 a.m., 5:00 a.m., 4:00 p.m., and 9:00 p.m.), there are no scheduled counts of inmates during the work day. When it comes to attempted escapes by inmates, prison officials at Allenwood may use "appropriate physical force" to prevent an escape.

At the sentencing hearing the district court denied Hillstrom's motion for a four-point offense level reduction pursuant to § 2P1.1(b)(3) of the Sentencing Guidelines. The court did not develop an independent factual record on the similarities *vel non* between Allenwood and community correction centers (CCCs) and the other facilities specified in § 2P1.1(b)(3). Instead, the court based its conclusion that the § 2P1.1(b)(3) reduction was unwarranted on the decision of Judge Muir in *United States v. Cordero*, unpublished order, (M.D.Pa., filed May 24, 1991), which held that a § 2P1.1(b)(3) reduction did not apply to an escapee from Allenwood, and on the affidavit of John T. Delemarre, an employee of the Bureau of Prisons, which had been submitted to Judge Muir in *Cordero*. Based on a total score of 11, the district court sentenced Hillstrom to 21 months of imprisonment for his escape. If Hillstrom had received the reduction in § 2P1.1(b)(3), his guideline imprisonment range would have been eight to fourteen months.

■ Hillstrom brought this appeal. We have jurisdiction pursuant to 18 U.S.C. § 3742(e). This appeal presents mixed questions of law and fact. On review, the trial court's findings of facts are measured by the clearly erroneous test, but our review of the legal component of its conclusion is plenary. *See United States v. Ezeiruaku*, 936 F.2d 136, 139 (3d Cir.1991).

## II.

Hillstrom contends that Allenwood is sufficiently similar to a CCC[1] to require application of § 2P1.1(b)(3). He asserts that the relevant security conditions and rules and regulations for prisoners are substantially alike at a CCC and at Allenwood, at least with reference to the more stringent aspect of the CCC Program. Hillstrom contends in this regard, that neither the district court nor the order of the Judge Muir on which the district court heavily relies, adequately considered both programmatic components of CCCs.

Hillstrom points out that there are two types of programs for prisoners at CCCs: a "pre-release" program and a "community corrections" program. The pre-release program is available to inmates who are about to be released after spending time in other, more secure federal correctional facilities. This program helps inmates make the transition back into society. In contrast, defendants may be sentenced directly to the community corrections program of the CCC, which serves primarily as a punitive term of incarceration rather than as a transition period. Hillstrom submits that the district court, as well as the *Cordero* opinion on which it relies, focuses exclusively on the pre-release program of the CCCs and, in so doing, underestimates the level of supervision, security, and oversight at CCCs in their community corrections programming. Hillstrom thus argues that, by failing to consider the punitive aspect of CCCs, the district court has mischaracterized CCCs by overstating the leniency of

---

**1.** The parties concede that CCCs, community treatment centers, and halfway houses are essentially the same, focusing their arguments on the similarities between Allenwood and CCCs. For this reason, we will refer only to CCCs in our analysis.

their policies towards inmates in the community corrections program.

The government responds that the district court sufficiently considered the similarities and differences between Allenwood and CCCs. It argues that the differences between the facilities identified by Judge Muir in *Cordero* and relied upon by the district court in this case adequately support the district court's conclusion that Hillstrom cannot benefit from a reduction under § 2P1.1(b)(3). The principal differences cited include the metropolitan location of CCCs in contrast to the rural location of Allenwood, and the differing levels of force which prison officials are authorized to use at CCCs and Allenwood. In addition, whereas prison guards patrol Allenwood at night, CCCs are unpatrolled both day and night. Finally, the government notes that inmates at Allenwood are subject to more restrictive visiting policies than their counterparts at CCCs.

■ As we have already explained, under § 2P1.1(b)(3), courts must engage in a two-part inquiry. First, a court must inquire whether the facility from which the defendant escaped is "non-secure" as defined by the notes to this section of the Sentencing Guidelines, *see* U.S.S.G. § 2P1.1 comment. (n. 1), a factor undisputed in this case. Second, a court must inquire whether the facility in question is similar to a CCC, a community treatment center (CTC), or a halfway house. *See* 2P1.1(b)(3) U.S.S.G.; *United States v. Brownlee*, 970

F.2d 764, 765 (10th Cir.1992) (per curiam); *United States v. Kahn*, 789 F.Supp. 373, 376 (M.D.Ala.1992). The parties' dispute involves this second prong and we now turn to it.[2]

### III.

### A.

This dispute about similarity is a function of the character of the programs at the institutions to be compared. As Hillstrom has contended, CCCs include two programmatic components—the "community corrections" component and the "pre-release" component. The better known of these, the pre-release component, serves inmates released from other institutions to prepare them for re-entry into society. As a general matter, prisoners are placed within the pre-release program for short terms, approximately 120 days or less. CCCs are located within or near metropolitan areas in order to bring prisoners in the pre-release program physically closer to the community. Similarly, the pre-release program generally includes an employment component through which a prisoner leaves the facility on a daily basis in order to work at a job in the community.

The pre-release program subjects prisoners to relatively lenient security and disciplinary policies while providing prisoners considerable personal freedom. For example, prisoners in the pre-release program are eligible to receive weekend and overnight passes[3] as well as furloughs.[4] In

---

**2.** We note that in requiring the two part inquiry, we are overturning the decision of the district court in *United States v. Crosby*, 762 F.Supp. 658, 661 (W.D.Pa.1991), which construed § 2P1.1(b)(3) to require only a single inquiry: whether the defendant has escaped from a "non-secure" facility. *See also United States v. Agudelo*, 768 F.Supp. 339, 340 (N.D.Fla.1991) (applying one-prong inquiry). This interpretation contravenes the plain language of the guideline, under which the "non-secure" status of a facility is a necessary, but not a sufficient condition for application of § 2P1.1(b)(3). *See United States v. Brownlee*, 970 F.2d 764, 765 (10th Cir.1992) (applying two-prong inquiry under § 2P1.1(b)(3)); *United States v. Kahn*, 789 F.Supp. 373, 375 (M.D.Ala.1992) (same). Furthermore, the single-inquiry interpretation of § 2P1.1(b)(3) adopted by the *Crosby* and *Agudelo* courts is undermined by the subsection that immediately precedes § 2P1.1(b)(3). Subsection (b)(2) also applies to escapes and autho-

rizes a sentence reduction "[i]f the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours." U.S.S.G. § 2P1.1(b)(2). Because under subsection (b)(2) a prisoner who returns within 96 hours is eligible for the relevant sentence reduction as long as the prison facility is non-secure and regardless of whether the prison facility can be deemed a "similar facility," it would be illogical to read subsection (b)(3) as applying to the same circumstance as subsection (b)(2), when subsection (b)(3) does include "similar facility" language. To do so would be to read the "similar facility" language out of subsection (b)(3).

**3.** Passes are issued for weekend or overnight visits within a 100 mile radius of the CCC.

**4.** Furloughs include those absences from the facility which last more than two consecutive nights or which take the prisoner more than 100 miles from the facility.

addition, some prisoners in the program are placed in home confinement, through which they are allowed to live at home while working during the day. As for disciplinary policy, staff may only use force to prevent loss or damage to property, to prevent a resident from self-inflicted harm, or to protect themselves.

In contrast to the pre-release program, the primary purpose of the community corrections component is punitive. Consequently, most of the personal freedoms afforded prisoners in the pre-release program are not provided to prisoners in the community corrections component of CCCs. For example, prisoners in the community corrections component, in contrast to their pre-release program counterparts, are not ordinarily eligible for passes, nor are they eligible for furloughs or home confinement. In addition, whereas pre-release prisoners may be accorded social and recreational privileges which enable them to leave the facility, prisoners in the community corrections component are ordinarily ineligible to leave the CCC for such purposes.

■ Clearly, the conditions under the *pre-release* program at CCCs are substantially different from those found at a prison camp such as Allenwood. Under the pre-release program, prisoners are apparently accorded a great deal more independence and trust than at a program at a prison camp. However, the lives of prisoners in the *community corrections* component appear to have more in common with those of prisoners at Allenwood. The point is that courts, when making the relevant comparison under § 2P1.1(b)(3), must consider *both* programs of CCCs before concluding whether the "similar facility" requirement has been met.

We reject the contention of several other courts that § 2P1.1(b)(3) simply "does not cover prison camps." *Kahn,* 789 F.Supp. at 377; *accord Brownlee,* 970 F.2d at 765; *United States v. Shaw,* 979 F.2d 41 (5th Cir.1992); *United States v. McGann,* 960 F.2d 846, 847 (9th Cir.1992) (per curiam). The court in *Kahn,* for example, asserts that the "similar facility" language in § 2P1.1(b)(3) should be read merely as a

"catchall phrase, intended to reach facilities which are similar to community corrections centers, community treatment centers, and halfway houses but which have, or may come to be known by a different name." 789 F.Supp. at 377. According to the *Kahn* court, the Sentencing Commission included the "similar facility" language as a precautionary measure in case it overlooked a facility that it should have specifically mentioned by name, or in case the names of community corrections centers, halfway houses, or community treatment centers come to change over time. *See id.* Similarly, the *Kahn* court contends that if the Commission had wanted § 2P1.1(b)(3) potentially to include prison camps, it would have mentioned them by name. However, this reasoning unjustifiably presumes both that the Commission was not aware of the available penal facilities for federal prisoners when it drafted § 2P1.1(b)(3) and is incapable of amending § 2P1.1(b)(3) to add new types of prison facilities that may emerge.

At a more substantive level, some courts have presumed that all prison camps are necessarily "generically different from the facilities listed in section 2P1.1(b)(3)." *McGann,* 960 F.2d at 847. However, this blanket presumption appears unwarranted in light of the existence of a punitive program at CCCs along with the relatively relaxed conditions at some Level 1, minimum security prisons. As the record before us reflects, at least at Allenwood, prisoners may be left unsupervised during the work day and may simply walk to the outside world. Instead of assuming that the Commission would have mentioned prison camps explicitly if they had wanted them included in the purview of § 2P1.1(b)(3), we believe that the Commission's inclusion of the "similar facility" language indicates that the Commission intended the courts to determine on a case-by-case basis whether the conditions at a specific prison camp are sufficiently similar to warrant a sentence reduction under § 2P1.1(b)(3).

B.

We believe that there is another facet to the similarity analysis that might be consid-

ered, that which concerns the safety consequences of an escape. Section 2P1.1(b)(3) is less than pellucid, and in attempting to decide what safety factors are relevant to the inquiry under the similarity prong, we glean little guidance from the language of the Guideline itself. However, the legislative history behind § 2P1.1, scant though it is, is also instructive.[5] We refer to the testimony before the Sentencing Commission which reflects what appears to be the primary justification for the distinction created by § 2P1.1(b)(3).

On March 30, 1990, Paul D. Borman, Chief Federal Defender for the Eastern District of Michigan, appearing on behalf of the Federal Defender System, testified that, "An escape from secure custody almost always involves a threat to people or property. The potential for violence may be significant.... The non-violent walkaway, on the other hand, does not present the potential dangers found in 'going over the wall.'" In other words, a major justification for greater punishment for those who escape from higher-security prisons is the danger that their very escape efforts will trigger the use of force by armed prison guards, including deadly force. This reaction by prison officials creates safety risks and dangers that are less likely to exist when a prisoner can merely walk away from a low security institution.

In addition, another aspect of the history behind the current version of § 2P1.1(b)(3) suggests that the Sentencing Commission was generally interested in providing reduced sentences for those who escaped from facilities with reduced security precautions. In 1990, the Commission substituted the current version of § 2P1.1(b)(3) for the previous provision, which had offered no sentence reduction for any escapee who did not voluntarily return within 96 hours—including escapees from the non-secure custody of CCC's. As we see it, in adding the current four-point reduction provision (only) for those who have escaped from CCC's or similar facilities, the Commission evinced an intent to afford lower sentences to those who were subjected to facilities that offer prisoners more lenient disciplinary policies and greater personal freedom.[6]

■ We therefore conclude that courts, in making a § 2P1.1(b)(3) "similarity" determination, should also consider the security policies of the facility in question and the safety ramifications of a prison escape. To so conclude is not to conflate the "non-secure custody" prong with the "similar facility" prong of the § 2P1.1(b)(3) test, but only to sharpen the focus upon the full range of relevant "similar facility" considerations.

## IV.

■ In this case, instead of holding an evidentiary hearing on the § 2P1.1(b)(3) motion, the district court simply adopted wholesale the analysis and conclusions of Judge Muir's unpublished memorandum in

---

**5.** Under 18 U.S.C. § 3553(b), a court in deciding whether to depart from the Guidelines is limited to consideration of the Guidelines themselves and to policy statements and official commentary of the Sentencing Commission. However, nowhere in the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq.,* is there a comparable restriction on courts in construing the Sentencing Commission's intent in amending the Guidelines. We believe that reference to the "legislative history" of a guidelines amendment, when it exists, can be quite helpful.

**6.** We note that this conclusion comports with the lesser risk of harm these escapees are likely to pose to society as well as with the Guidelines' overarching goal of uniformity. Because pris-

oners in a non-secure facility deemed similar to a CCC or in the punitive component of a CCC have usually been convicted of lesser crimes, and prisoners in the pre-release program of a CCC have relatively good prison records which have resulted in their transfer to less secure facilities, they presumably are less likely to commit violent acts after having escaped. In addition, prisoners who escape from the non-secure custody of a CCC or similar facility generally do so by merely walking away from a work detail. Their similar behavior to effect the act of escape—the crime at issue here— arguably should receive similar punishment under the Guidelines' general goal of uniformity in sentencing.

the *Cordero* case.[7] While this approach was not in and of itself objectionable, it is problematic here for two reasons.

First, in *Cordero,* Judge Muir based his analysis of the § 2P1.1(b)(3) motion before him—which also involved an escape from Allenwood—solely upon the affidavit of John T. Delmarre, an employee of the Bureau of Prisons. This affidavit, from which Judge Muir quoted at length in his opinion, described and contrasted conditions at Allenwood and at CCCs. While the affidavit adequately described programs and security at Allenwood, it referred only to the prerelease program at CCCs and gave no indication that CCCs also contain a punitive program which may indeed prove to be similar to the situation at Allenwood. Rather, the affidavit, based on an incomplete picture of CCCs, makes the conclusory finding that CCCs and Allenwood are not similar facilities for § 2P1.1(b)(3) purposes. In addition, Judge Muir's opinion simply relies on this affidavit to support its conclusion without any consideration of the safety consequences of an escape.

Second, the district court relied totally on the *Cordero* decision, and did not explain the facts independently, as it was required to do in view of the shortcomings of *Cordero.* While the district court's denial of Hillstrom's § 2P1.1(b)(3) motion may ultimately prove to be the correct result, the district court arrived at its determination without adequate consideration of whether Allenwood is sufficiently similar to a CCC, recognizing *both* purposes of those facilities, as well as the security and safety considerations mentioned above. Accordingly, we will vacate the judgment and will remand this case to the district court for further proceedings consistent with this opinion.

**7.** We affirmed the decision in *Cordero* by unpublished judgment order, *see United States v. Cordero* [950 F.2d 723 (Table) ], No. 91–5485 (3d Cir. filed Nov. 7, 1991). That disposition, however, is non-precedential. *See* Internal Operating Procedures of the U.S. Court of Appeals for the Third Circuit § 5.5, at 6.