**UNITED STATES of America,**

v.

**Patrick Lawrence PETRO.**

**No. 4:CR–92–242.**

United States District Court,
M.D. Pennsylvania.

May 10, 1993.

George Rocktashel, Asst. U.S. Atty., Lewisburg, PA, for U.S.

James Robert Protasio, South Williamsport, PA, for Petro.

## OPINION

MUIR, District Judge.

### I. Introduction.

On January 4, 1991, Patrick Lawrence Petro was sentenced by a district court in the District of New Mexico to 121 months imprisonment on a conviction for possession with intent to distribute more than 5 kilograms of cocaine. On February 13, 1991, Petro surrendered to the custody of the Bureau of Prisons and was transferred to the Federal Prison Camp at Allenwood (hereinafter referred to as "Allenwood"), Montgomery, Pennsylvania.

On September 14, 1992, during the 4:00 p.m. count at Allenwood, a discrepancy in the number of inmates was discovered for Unit B-1. Correctional staff determined that Petro was missing from his assigned area and searched the surrounding area but did not locate him. At approximately 4:55 p.m., the United States Marshal's Service, the Pennsylvania State Police and local authorities were notified that Petro had escaped. On September 16, 1992, Petro was apprehended in West Fairview Township, York County, Pennsylvania, at approximately 2:00 a.m., walking along railroad tracks. He was returned to the United States Penitentiary at Lewisburg.

A grand jury handed down a one-count indictment against Petro charging him with escape in violation of Title 18, United States Code, Section 751(a). At arraignment Petro entered a plea of guilty pursuant to a written plea agreement which provided in part that in exchange for his plea the government would recommend that the Court impose a minimum prison term within the applicable sentencing guideline range. We accepted the guilty plea and plea agreement reserving the right to impose any lawful sentence, ordered the preparation of a presentence report and scheduled a presentence conference and a presentence hearing. The presentence report was prepared by probation officer Drew Thompson and submitted to Petro, defense counsel and the government on February 16, 1993. Neither the government nor Petro filed objections to the presentence report. The probation officer determined that the base offense level is 13, the total offense level is 11, the criminal history category is III, the guideline imprisonment range is 12 to 18 months, and the fine range is $2,000 to $20,000.

At the presentence conference it was determined that there were no factual errors in the presentence report. However, in light of a recent opinion by the Court of Appeals for the Third Circuit dealing with § 2P1.1 of the United States Sentencing Guidelines, it was determined that it was necessary to hold a presentence hearing.

Section 2P1.1 provides in pertinent part:

§ 2P1.1 Escape, Instigating or Assisting Escape

(a) Base Offense Level:

(1) 13, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense;

\* \* \* \* \* \*

(b) Specific Offense Characteristics

\* \* \* \* \* \*

(3) If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house," or similar facility, ... decrease the offense level under subsection (a)(1) by 4 levels....

The Court of Appeals in *United States v. Hillstrom,* 988 F.2d 448 (3d Cir.1993) (slip opinion) vacated the judgment of sentence and remanded the case to the district court to determine whether Allenwood is "similar to" a community corrections center, community treatment center or "halfway house". Petro did not controvert the position conceded by the parties in *Hillstrom* that community corrections centers, community treatment centers and halfway houses are essentially the same with respect to the conditions of confinement and security policies and the safety ramifications of an escape. Moreover, Petro's arguments and proposed findings of fact addressed only how Allenwood compares to community corrections centers and for those reasons we will refer hereinafter only to community corrections centers. *See Hillstrom,* 988 F.2d at 450 n. 1.

In determining whether a prison camp is similar to a community corrections center, the Court of Appeals held that the district court should consider both the pre-release components and the community corrections components of community corrections centers. The Court of Appeals in *Hillstrom* indicated that the district court had not considered the community corrections components of community corrections centers in making the comparison between Allenwood and community corrections centers. The Court of Appeals also stated that we should consider not only the conditions of confinement and the programs at Allenwood versus those at community corrections centers but we should consider the security policies of the facilities in question and the safety ramifications of a prison escape therefrom. *Hillstrom,* 988 F.2d at 453.

A presentence hearing to determine whether Allenwood is a facility similar to a community corrections center was held on April 29, 1993. The following are the Court's findings of fact, discussion, and conclusions of law regarding this issue.

## II. Findings of Fact.

1. Minimum security federal prison camps, such as Allenwood, are operated by the Federal Bureau of Prisons, an agency of the U.S. Department of Justice, and are used for the sole purpose of housing convicted offenders committed to the custody of the United States Attorney General. (Undisputed, hereinafter "U")

2. Community corrections centers are non-federal, privately operated contract facilities. (U)

3. Community corrections centers consist of two programmatic components, the pre-release component and the community corrections component. (U)

4. Offenders in the pre-release component are in the community corrections center for the purpose of making a transition from the institutional setting to the community. (U)

5. Offenders in the community corrections component are in the community corrections center primarily as a punitive sanction. (U)

6. Conditions in the community corrections component are more restrictive than the pre-release component. (U)

7. Security is less restrictive in the community corrections component of a community corrections center than at Allenwood.

8. Community corrections centers also house individuals who are placed in their care as a condition of probation, supervised release, or bond, and are not deemed to be in the custody of the Attorney General or Bureau of Prisons. (U)

9. Inmates housed in minimum security federal prison camps, such as Allenwood, receive an initial custody assignment of "Out," which requires a minimum of two-hour intermittent staff supervision; additionally, they must remain within the confines of the facility perimeter. (U)

10. Inmates who are completing the latter portion of their federally-imposed sentence in the pre-release component of a community corrections center are encouraged to engage in unsupervised community activities such as seeking and maintaining gainful full-time employment, establishing a permanent release residence, and strengthening family ties. (U)

11. Although community corrections component residents are not permitted to leave the facility for social or other purposes, they are permitted to leave the facility for employment and other approved program activities such as seeking employment, meals served through a local restaurant, or attending religious services without prior approval. (U)

12. Inmates at Allenwood are employed in job assignments, are provided meals, and are permitted to attend religious services, all within the physical confines of the institution.

13. Minimum security federal prison camps, such as Allenwood, are generally located in rural, non-metropolitan areas, while community corrections centers are generally located in large population centers and are situated close to public transportation to enhance employment and other program activities.

14. Medical and dental care provided to inmates in minimum security federal prison camps, such as Allenwood, is provided free of charge to the inmate population. In community corrections centers, expenses for a resident's medical and dental care are ordinarily the responsibility of each resident.

15. The staff/inmate ratio for minimum security federal prison camps, such as Allenwood, are established by the Federal Bureau of Prisons at its Central Office in Washington, D.C., and are applied to all minimum security federal institutions nationwide. (U)

16. The staff/inmate ratios at contract community corrections centers vary from center to center and are the subject of an agreement between the operator and the Bureau of Prisons.

17. In minimum security federal prison camps, such as Allenwood, inmate access to telephones is strictly controlled and all inmate telephone calls with the exception of legal calls are subject to monitoring; no such controls exist in contract community corrections centers.

18. In minimum security federal prison camps, such as Allenwood, staff may use "appropriate physical force" to prevent an escape, while at community corrections centers, staff may use physical force only to prevent loss or damage to property, to prevent a resident from self-inflicted harm, or in self-defense. (U)

19. At minimum security federal prison camps, such as Allenwood, the Warden may authorize the use of firearms to prevent an escape; in contrast, the possession, or use, of firearms at contract community corrections centers by staff members is strictly prohibited. (U)

20. In the event of an escape from a minimum security federal prison camp, such as Allenwood, staff are often assigned to "escape posts" and patrol outside the prison camp in an attempt to locate the escaped inmate as soon as possible; no such procedure exists in contract community corrections centers.

21. An inmate at Allenwood is transferred to a low security facility if a disciplinary infraction of serious magnitude is committed by that inmate.

22. Residents of contract community corrections centers who engage in unauthorized behavior, such as the use of alcohol or drugs, and are deemed by center staff to be in need of a "more controlled environment" are often returned to minimum security federal prison camps such as Allenwood. (U)

23. Minimum security federal prison camps house only convicted offenders committed to the custody of the United States Attorney General and can serve a sentence of up to ten (10) years; individuals in the corrections component of a community corrections center typically serve no more than twelve (12) months in such a facility. (U)

24. If a community corrections center does not have in-house recreational capabilities, individuals in the community corrections component may sign out for up to one hour per day to the immediate vicinity of the facility for purpose of exercise and recreational activity. (U)

25. Inmates of a prison camp are required to use the recreational facilities provided at the institution and are not permitted to leave the physical confines of the camp for exercise or recreation. (U)

26. Residents of the community corrections component of a community corrections center are eligible for home confinement, i.e., to be temporarily released to live at the resident's home while continuing in official detention at the community corrections center, if ordered by the Court.

27. Allenwood maintains an armory which contains various weapons including shot guns, 38 caliber handguns, and M-16 rifles. Community corrections centers do not maintain armories. Staff at Allenwood are trained in the use of firearms and are permitted to use firearms.

28. Staff at Allenwood are authorized to use force, including physical force, in a variety of situations such as preventing physical altercations between inmates, stopping inmate disturbances, and preventing escapes. (U)

202

29. The staff at community corrections centers do not use or possess firearms.

30. The average length of sentence at Allenwood is two and one-half (2½) years, and the maximum sentence to be served by an inmate at Allenwood is ten (10) years. (U)

31. Allenwood houses inmates that are classified as "Community." (U)

32. Allenwood generally does not house violent inmates. (U)

### III. Discussion.

The issue that we must decide is whether Allenwood is a facility similar to a community corrections center. In *Hillstrom*, the district court denied a motion for a four-level reduction pursuant to § 2P1.1(b)(3) of the sentencing guidelines on the ground that Allenwood was not similar to a community corrections center. The Court of Appeals held that the district court did not develop an independent factual record on the similarities between Allenwood and community corrections centers. Instead, the Court of Appeals stated that the district court based its conclusion that the § 2P1.1(b)(3) reduction was unwarranted on the decision of the undersigned in *United States vs. Cordero*, unpublished order, (M.D.Pa., filed May 24, 1991). In *Cordero*, we held that § 2P1.1(b)(3) did not apply to an escape from Allenwood relying on the affidavit of John T. Delemarre, an employee of the Bureau of Prisons which had been submitted to the undersigned.

The Court of Appeals in *Hillstrom* stated "[c]learly, the conditions under the *pre-release* program at CCCs are substantially different from those found at a prison camp such as Allenwood." 988 F.2d at 452. The Court of Appeals focused on the corrections component of community corrections centers and indicated that in making a comparison we should compare the corrections components of community corrections centers with the programs at Allenwood. In *Hillstrom*, the Court of Appeals was of the view that most of the personal freedoms afforded prisoners in the pre-release program are not provided to prisoners in the community corrections components of community corrections centers. 988 F.2d at 451–52. Specifically, the Court of Appeals was of the view

that prisoners in the community corrections component in contrast to their pre-release program counterparts are not ordinarily eligible for passes, nor are they eligible for furloughs or home confinement. 988 F.2d at 452. In addition, the Court of Appeals was of the view that whereas pre-release prisoners may be accorded social and recreational privileges which enable them to leave the facility, the prisoners in the corrections components are ordinarily ineligible to leave the community corrections centers for such purposes. 988 F.2d at 452. The testimony presented at the presentence hearing on April 29, 1993, is to the contrary.

As the record developed in this case indicates there are numerous dissimilarities between the conditions of confinement in the corrections component of a community correction center and the conditions at Allenwood. The inmates at Allenwood are employed on site. In contrast, individuals at community corrections centers are employed off-site. Psychiatric counselling at Allenwood is conducted on-site. Psychiatric counselling for individuals at a community corrections center is conducted off-site. Religious services at Allenwood are conducted on-site. At a community corrections center religious services are conducted off-site. At Allenwood meals are prepared on-site. At a community corrections center meals are prepared off-site. Meals are generally eaten off-site at community corrections centers. The inmates at Allenwood eat their meals on-site. At Allenwood meals are furnished by the government. In contrast, at community corrections centers meals are purchased by the residents. At Allenwood medical and dental care is provided to the inmates at the expense of the government. At community corrections centers medical and dental care is ordinarily paid for by the inmates. Medical and dental care is provided on-site at Allenwood. Medical and dental care of individuals at the community corrections centers is provided off-site.

*Hillstrom* mandates that we compare the security policies of the facilities and the safety ramifications of a prison escape. The staff

at Allenwood are Bureau of Prisons personnel who receive mandatory training above and beyond any college education that they may have received. In contrast, staff at the community corrections centers are not Bureau of Prisons personnel and do not receive the mandatory training. There is a difference between the inmate/staff ratio at Allenwood and at the community corrections centers. The ratio at Allenwood is 4 inmates per 1 staff member and at community corrections centers, the ratio is 10 inmates per 1 staff member. Individuals at Allenwood are not eligible for home confinement. In contrast, individuals at a community corrections center are eligible for home confinement if the committing court so orders. With respect to the use of the telephone at Allenwood all calls are monitored except legal calls. In contrast, calls are not monitored at community corrections centers. The maximum sentence imposed at Allenwood is 10 years in contrast to a maximum sentence of 12 months at a community corrections center. At Allenwood, the inmates must be observed by staff at least once every two hours. An individual at a community corrections center must be observed only once during the day. Force can be used to prevent an escape at Allenwood while the staff at a community corrections center are not permitted to use force to prevent an escape.

With respect to disciplinary infractions at the two types of facilities, an inmate at Allenwood, a minimum security institution, is transferred to a low security facility if a disciplinary infraction of serious magnitude is committed by that inmate. In contrast, at a community corrections center if an individual at such a facility commits a disciplinary infraction, that individual is transferred to a minimum security facility such as Allenwood.

In light of the foregoing dissimilarities and those set forth in our findings of fact, we cannot conclude that Allenwood is sufficiently similar to the corrections component of a community corrections center to justify a four-level reduction in Petro's base offense level pursuant to U.S.S.G. § 2P1.1(b)(3). There are great dissimilarities between the conditions of confinement of prisoners in the community corrections component of a community corrections center and the conditions of confinement of prisoners incarcerated at

Allenwood. Moreover, with respect to the security policies at and the safety ramifications of an escape from Allenwood in contrast to an escape from a community corrections center an escape creates a greater risk to staff at Allenwood than staff at a community corrections center. Staff at a community corrections center do not have to exercise any force in restraining an individual from leaving such a facility. Instead, they notify appropriate authorities. In contrast, at Allenwood, the staff are obliged to take measures to prevent an escape including the use of deadly force if necessary. The fact that the staff at Allenwood is entitled to use deadly force to prevent an escape and the staff at a community corrections center is not so entitled would indicate that the Bureau of Prisons considers an escape from Allenwood to be of greater consequence to the safety of society than one from a community corrections center.

IV. Conclusions of Law.

1. When he escaped from Allenwood, defendant Petro was in non-secure custody.

2. Allenwood is not similar to the community corrections component of a community corrections center.

3. Allenwood is therefore not a "similar facility" for purposes of Section 2P1.1(b)(3) of the Sentencing Guidelines.

4. Because Allenwood is not a facility similar to a community corrections center, the defendant Petro is not entitled to a four-level reduction of the four offense level under § 2P1.1(b)(3).

5. The base offense level is 13.

6. The total offense level is 11.

7. The Criminal History Category is III.

8. The guideline imprisonment range is 12 to 18 months.

9. The guideline fine range is $2,000 to $20,000.