**UNITED STATES of America**

v.

**Carl HILLSTROM, Defendant.**

**No. 3:CR–91–0242.**

United States District Court, M.D. Pennsylvania.

Nov. 4, 1993.

---

Barbara Kosik Whitaker, Asst. U.S. Atty., Scranton, PA, for government.

D. Toni Byrd, Asst. Fed. Public Defender, Williamsport, PA, for defendant.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

This case presents the issue of whether the Federal Prison Camp at Allenwood, Montgomery, Pennsylvania ("FPC–Allenwood"), is a facility similar to a community corrections center, community treatment center, or halfway house within the meaning of § 2P1.1(b)(3) of the United States Sentencing Commission Guidelines (USSG § 2P1.1(b)(3)).

On February 3, 1992, defendant Carl Hillstrom pleaded guilty to a charge of escape from federal custody in violation of 18 U.S.C. § 751(a). He was sentenced by this court to a term of incarceration of 21 months, to run consecutive to the term for which he had previously been imprisoned. A term of supervised release of three years was to follow the term of incarceration.

On March 12, 1993, the sentence was vacated by the United States Court of Appeals for the Third Circuit "[b]ecause we believe that the [district] court based its decision on an incomplete description of the nature of community correction centers and an inadequate consideration of what we take to be one of the primary policy justifications behind the adoption of the current version of § 2P1.1(b)(3) ..." *United States v. Hillstrom*, 988 F.2d 448 (3d Cir.1993). The Third Circuit remanded the case to this court for reconsideration of the sentence, emphasizing particular factors to be considered in making the comparison.

On September 16, 1993, a hearing was conducted at which both the government and Hillstrom presented evidence relevant to the considerations set forth by the Third Circuit. In addition to reconsideration of the sentence

imposed, the court has before it a motion by Hillstrom to proceed *pro se* and for a supplemental hearing on the conditions at FPC–Allenwood.

Hillstrom's motion to proceed *pro se* will be denied as untimely. Moreover, we conclude that FPC–Allenwood is not a "similar facility" within the meaning of USSG § 2P1.1(b)(3).

## DISCUSSION:

### I. MOTION TO PROCEED PRO SE AND FOR A SUPPLEMENTAL HEARING

■ Following the hearing on September 16, 1993, Hillstrom filed a *pro se* document entitled, "OBJECTION, REQUEST FOR SUPPLEMENTAL HEARING AND REQUEST TO PROCEED PRO SE." The document is dated September 17, and was docketed by the Clerk's Office on September 22, 1993. Hillstrom therein raises a number of allegations, including ineffective assistance of counsel in presenting an "incomplete and erroneous picture of Allenwood" and inadequate communication with counsel. On October 25, 1993, Hillstrom filed a "CLARIFICATION" of the above-entitled document in which he expands upon the arguments raised in his "OBJECTION."

Based upon the documents filed with the court, the questions asked by counsel at the September 16 hearing, and the testimony of investigator Larry Crisman of the Federal Public Defender's Office, the allegation of inadequate preparation is without foundation. There clearly appears to have been a thorough and exhaustive investigation into the facts of this case. In fact, of the 207 proposed findings of fact, Hillstrom notes in his motion that he disagrees with just one, and indicates that the problematic finding was no. 197. While we agree that it would be easier to detect an escapee from the camp compound than from a work detail, this finding does not change our conclusion.

Hillstrom also points to proposed finding no. 203, which was disputed as of the hearing date. He points out that there is authority for this finding, and appears to be suggesting that the "dispute" indicates an inadequate presentation by counsel. First, the proposed findings of fact filed September 23, 1993, indicate that finding no. 203 was no longer disputed. Second, whether the government disputes any fact does not indicate that counsel somehow was ineffective.

■ More importantly, at no time prior to or during the September 16 hearing did Hillstrom indicate a desire to proceed *pro se,* nor did he express to the court any dissatisfaction with counsel. It was only after the hearing that this dissatisfaction apparently manifested itself. Hillstrom has provided no reason to support his contention that a supplemental hearing is necessary, nor any reason why the court should defer ruling in order to accommodate his new-found desire to proceed *pro se.* Finally, the court finds no basis in the law to allow any defendant to proceed as "pro se co-counsel" as requested by Hillstrom. The motion filed by Hillstrom will be denied.

Hillstrom's remaining arguments are directed toward the issues raised at the September 16 hearing and in the Third Circuit's opinion, and so will be addressed in the appropriate section of this memorandum.

### II. UNDERLYING FACTS

On February 7, 1990, Hillstrom was sentenced to 62 months' incarceration, to be followed by five years of supervised release, upon conviction in the United States District Court for the Southern District of Florida for importation of marijuana into the United States. On March 23, 1990, he arrived at FPC–Allenwood to serve that sentence.

On October 10, 1990, Hillstrom was assigned to mow grass in a field outside of the confines of the prison camp. The area in which he was to work was out of the sight of corrections officers. After lunch was delivered to him, which may have been approximately 9:30 a.m. (according to Hillstrom) or 10:30 a.m. (according to Dennis Faulk, a unit manager at FPC–Allenwood), Hillstrom abandoned the tractor he had been using in a wooded area near the field and left.

On November 20, 1991, Hillstrom and his girlfriend were apprehended as they attempted to enter the United States from

Canada. Hillstrom was indicted for the escape six days later.

Following a plea of guilty, the court imposed a sentence of 21 months, to be followed by three years of supervised release. This sentence was based upon the following: a total offense level of 11; a criminal history score of 9; and a criminal history category of IV.[1] The sentencing range was 18 to 24 months, and the court imposed a sentence in the middle of the range.

At Hillstrom's sentencing on April 29, 1992, he contended that a 4–point reduction in offense level was necessary under USSG § 2P1.1(b)(3), which states in pertinent part:

> If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house," *or similar facility,* ... decrease the offense level under subsection (a)(1) by 4 levels ...

(Emphasis added.) While it was undisputed that incarceration at FPC–Allenwood is "non-secure custody," we concluded that the camp is not a "similar facility" to a community corrections center ("CCC"), community treatment center, or a halfway house. This finding was based in large part upon *United States v. Cordero,* No. 1:CR–89–0170–02, slip op. (M.D.Pa. May 24, 1991), *aff'd,* 950 F.2d 723 (1991) (table), in which it was held that FPC–Allenwood was not similar to any of the facilities listed in USSG § 2P1.1(b)(3).

As noted above, our judgment of sentence was vacated by the Third Circuit and the case was remanded for a hearing and reconsideration of sentence. A closer examination of the opinion of the Third Circuit is appropriate in order to set forth clearly the basis for our determination that FPC–Allenwood is not similar to a CCC.

## III. THE OPINION OF THE THIRD CIRCUIT

In *United States v. Hillstrom,* 988 F.2d 448 (3d Cir.1993), the Third Circuit stated that it believed that our sentence was based upon an incomplete description of the nature of a CCC and an inadequate consideration of a primary policy justification underlying USSG § 2P1.1(b)(3). *Hillstrom,* 988 F.2d at 449. By order in lieu of a formal mandate, the Third Circuit vacated the sentence and remanded "for further proceedings consistent with the opinion of this Court." *United States v. Hillstrom,* No. 92–7237 (3d Cir. unpublished order filed March 12, 1993).

In *United States v. Petro,* 822 F.Supp. 198 (M.D.Pa.1993), the Honorable Malcolm Muir again held[2] that FPC–Allenwood was not similar to a CCC. While we again reach the same conclusion as Judge Muir, this conclusion is not based upon that case. Instead, we rely on our own findings of fact and conclusions of law, since: (1) the order of the Third Circuit specifically directs "further proceedings" in the instant case; and (2) a more complete factual record was developed in the instant case.

The Third Circuit began its analysis under USSG § 2P1.1(b)(3) with a two-pronged inquiry: (1) whether the institution from which the defendant escaped is a "non-secure" facility under that section, *see* USSG § 2P1.1 Commentary Application Note 1; and (2) whether the facility is similar to a CCC, community treatment center, or halfway house. *Hillstrom,* 988 F.2d at 451. As noted by the Third Circuit, the first prong of this inquiry is not in question. *Id.* Also, the parties have confined their arguments to comparison of FPC–Allenwood to a CCC.[3] *Hillstrom,* 988 F.2d at 450 n. 1.

---

1. Although the court referred to a criminal history category of V, *see* Notes of Testimony of April 29, 1992 (record document no. 22), and Statement of Reasons appended to the Presentence Report, the Presentence Report indicates that the correct criminal history category is IV, and Hillstrom was sentenced consistently with such a criminal history category. *See* United States Sentencing Commission Guidelines Manual, Sentencing Table (indicating that, with an offense level of 11 and criminal history category of IV, sentencing range is 18 to 24 months, with a comparable range of 24 to 30 months with a criminal history of V).

2. Judge Muir also presided over *United States v. Cordero, supra.*

3. Ordinarily, we would apply the canon of construction of *ejusdem generis* in this instance. "Under the principle of ejusdem generis, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumer-

The Third Circuit then went on to note that there are two components to a CCC, pre-release and community corrections, and that, while incarceration at FPC–Allenwood is not similar to the pre-release component, "the lives of prisoners in the *community corrections* component appear to have more in common with those of prisoners at [FPC–]Allenwood." *Hillstrom,* 988 F.2d at 452 (emphasis in original).

The Court next rejected the opinions of a number of courts which have held that the four-point reduction pursuant to USSG § 2P1.1(b)(3) does not apply to prison camps. *Id.,* citing *United States v. Shaw,* 979 F.2d 41 (5th Cir.1992); *United States v. Brownlee,* 970 F.2d 764 (10th Cir.1992) (per curiam); *United States v. McGann,* 960 F.2d 846 (9th Cir.) (per curiam), *cert. denied,* — U.S. ——, 113 S.Ct. 276, 121 L.Ed.2d 204 (1992); *United States v. Kahn,* 789 F.Supp. 373 (M.D.Ala.1992). *See also, United States v. Tapia,* 981 F.2d 1194 (11th Cir.1993) (in accord with above-listed cases), *cert. denied,* — U.S. ——, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993). *But see United States v. Agudelo,* 768 F.Supp. 339 (N.D.Fla.1991).

■ The Court then addressed what it considered to be one of the "primary policy justifications" underlying USSG § 2P1.1(b)(3): that those who escape from higher-security institutions be punished more severely because of the safety ramifications inherent in their conduct, since escape from a high-security facility may trigger the use of greater (or even deadly) force by prison officials. *Hillstrom,* 988 F.2d at 452–453. Therefore, a district court should consider the security policies of the facility and the

safety ramifications of escape. *Hillstrom,* 988 F.2d at 453.

■ In light of the Third Circuit's opinion, it appears that the comparison between a CCC and the facility from which the escape has been effected is to be made on a case-by-case basis.[4] Among the factors to be considered are: whether the purpose of placement is primarily punitive or primarily rehabilitative; inmate employment; provision of meals, religious services and facilities, recreation, etc., on-site or off-site; provision of medical and dental services on-site or off-site, and payment for such services; authorization of staff to prevent escape; use of force and/or firearms by staff; whether the Bureau of Prisons operates the facility; ratio of inmates to staff; and reasons for which inmates may leave the grounds. This list is not intended to be exhaustive, though we believe a thorough list of factors to be considered was provided by Judge Muir in his chart appended to *United States v. Petro, supra.* Both the government and Hillstrom relied extensively on that list.

## IV. FINDINGS OF FACT

### FEDERAL PRISON CAMPS:

1. FPC–Allenwood is a minimum security, federal prison camp located in Montgomery, Lycoming County, Pennsylvania.

2. Minimum security federal prison camps are operated by the Federal Bureau of Prisons (BOP), an agency of the Department of Justice, and are used for the primary purpose of housing convicted offenders committed to the custody of the United States Attorney General.

---

ation." *Norfolk & Western Rw. Co. v. Brotherhood of Rw. Carmen,* 499 U.S. 117, 129, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95, 107 (1991) (citation omitted). When the general words follow an enumeration of particular classes, "the general words should be construed as applying only to things of the same general class as those enumerated." *Samuels, Kramer & Co. v. Commissioner of Internal Revenue,* 930 F.2d 975, 980 n. 2 (2d Cir.) (citing Black's Law Dictionary 517 (6th ed. 1990)), *cert. denied,* — U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991). In this instance, "similar facility" would apply to things of the same class as a CCC, community treatment

center, and a halfway house; in other words, all three would be compared. Consistently with the opinion of the Third Circuit, *see Hillstrom, supra,* 988 F.2d at 450 n. 1, we have confined our comparison to CCC's.

4. In this instance, "case-by-case" refers to an examination of the institution from which an escape was made, not an examination of the circumstances concerning each escape, as argued by Hillstrom. This argument is discussed further, *infra,* Section VI(F) of this memorandum.

*COMMUNITY CORRECTIONS CENTERS:*

3. A community corrections center ("CCC") is a specific type of facility owned and operated by a party (state, county, or private) which contracts with the BOP.

4. The contract between the BOP and the contractor for the operation of a CCC includes the Statement of Work, Community Corrections Centers, by which the contractor agrees to abide.

5. CCC's are non-federal correctional facilities used for the purpose of housing convicted offenders.

6. The only facility in the Middle District of Pennsylvania which is a CCC, i.e. for which there is a contract embodying the Statement of Work, Community Corrections Centers, is the Catholic Services CCC in Scranton, Luzerne County, Pennsylvania.

*OTHER CONTRACT FACILITIES:*

7. The BOP also contracts with parties to house inmates committed to the custody of the Attorney General in facilities which are not CCC's, including county jails and work release centers.

8. The contracts between the BOP and these contractors do not include the Statement of Work, Community Corrections Centers; in fact, they are wholly separate contracts.

9. Conditions of confinement in a CCC and a county jail vary significantly, since a county jail is a secure facility which may house both violent and non-violent offenders.

10. The BOP currently has contracts with 625 facilities, 271 or 43% of which are county jails and state prisons.

11. Of the 18 facilities in Pennsylvania with which the BOP has contracts to provide services, 13 or 72% are county prisons or jails.

12. There are nine facilities with community corrections components in the Middle District of Pennsylvania with which the Federal BOP has contracts: (1) Catholic Services Community Corrections Center in Scranton (*see* Finding of Fact No. 6, *supra*); (2) Cumberland County Prison; (3) Lycoming County Work Release Center; (4) Lackawanna County Prison; (5) Lebanon County Prison; (6) Montour County Jail; (7) Northumberland County Prison; (8) Snyder County Prison; and (9) York County Prison (collectively, the "listed facilities").

*PROGRAMMATIC COMPONENTS OF COMMUNITY CORRECTIONS CENTERS:*

13. CCC's consist of two programmatic components, the pre-release component and the community corrections component.

14. Offenders in the pre-release component are in the CCC for the purpose of making a transition from the institutional setting to the community, or as a resource while under supervision.

15. Offenders are placed in the community corrections component primarily as a punitive sanction.

16. CCC's do not differentiate the two programmatic components between inmates who are on work release and inmates who are not on work release; work-release and non-work-release inmates are subject to the same conditions within the community corrections component. *See* Statement of Work at 22.

17. Some CCC's differentiate the two programmatic components between inmates who are directly committed to the CCC's by the court, and inmates who are transferred from other institutions.

18. Conditions of confinement in the community corrections components of CCC's are more restrictive than the pre-release component.

19. A contract between the BOP and a non-CCC facility also may include a community corrections component and/or a pre-release component.

20. As of September 16, 1993, the BOP was housing inmates in a pre-release capacity at the York County Prison, Cumberland County Prison, and Lebanon County Prison pursuant to the contracts those institutions have with the BOP.

21. CCC's house "direct court commitments," meaning offenders committed to the BOP's custody recommended by the courts to serve their entire terms of confinement in a CCC or offenders committed directly by

the court to serve terms of incarceration in a CCC as a condition of probation or supervised release.

22. The BOP also may house inmates with direct court commitments in jail-type facilities with a community corrections component.

23. Based on a review of the nine facilities with community corrections components in the Middle District of Pennsylvania, security varies depending upon the facility, whether the inmate has been directly committed by the court or not, whether the inmate is on work release or not, and whether the facility is a CCC or a county prison or jail.

*HOUSING AND SECURITY:*

24. Inmates at FPC–Allenwood are housed in dormitory-style housing which is not locked-down.

25. Inmates at Catholic Services CCC and the Lycoming County Work Release Center are housed in dormitory-style housing which is not locked-down.

26. Inmates in the following facilities who are not on work release are housed in the general population area of the prison which is a cell-type, lock-down jail: Cumberland County Prison; Lackawanna County Prison; Lebanon County Prison; Montour County Jail; Northumberland County Prison; Snyder County Jail; and York County Jail.

27. Inmates at the Cumberland County Prison who are on work release are housed in the same type setting when they are not out on work release; however, they are housed in a separate unit.

28. Inmates at the following facilities who are on work release are housed in dormitory-style, lock-down housing when they are not out on work release: Lackawanna County Prison; Lebanon County Prison; Montour County Jail; Northumberland County Prison.

29. Unlike inmates at FPC–Allenwood, inmates at the Cumberland County Prison, Lackawanna County Prison, Lebanon County Prison, Montour County Jail, Northumberland County Prison, Snyder County Jail, and the York County Jail who are not on work release status are not in a position easily to walk away from the institutions because they are housed in locked-down cell-type settings. However, inmates on work release status may be in a position to walk away from the job site.

30. Security in those facilities listed above where inmates are housed in a locked-down, secured-type setting is more restrictive than at FPC–Allenwood because those inmates are not in a position simply to walk away from the institutions.

*TYPES AND CLASSIFICATION OF INMATES:*

31. CCC's house individuals who are placed in their care as a condition of probation, supervised release, or bond, and are not deemed to be in the custody of the Attorney General as well as offenders committed to the custody of the Attorney General who are recommended by the courts to serve their entire terms of confinement in a CCC.

32. FPC–Allenwood houses only offenders who are committed to the custody of the Attorney General.

33. Inmates housed in minimum security federal prison camps, such as FPC–Allenwood, receive an initial custody assignment of "out;" however, inmates housed at minimum security federal camps may also receive a custody assignment of "community."

34. CCC's and FPC–Allenwood house inmates that are classified as "community."

35. FPC–Allenwood and CCC's generally do not house violent inmates.

*EMPLOYMENT AND WORK DETAILS:*

36. Most inmates at FPC–Allenwood are employed in job assignments within the immediate confines of the prison camp compound; however, some job assignments may be outside the immediate confines of the prison camp compound.

37. Inmates at FPC–Allenwood may be assigned to work details on the government reservation outside the immediate confines of the prison camp compound, such as mowing the lawn and cutting the fields.

38. Inmates at FPC–Allenwood have been assigned to work details at the United

States Penitentiary at Lewisburg and are assigned to work at the Federal Prison Complex at Allenwood.

39. Some inmates at FPC–Allenwood have tasks which require them to go outside the facility perimeter, such as "town drivers."

40. Inmates at FPC–Allenwood are not confined to the camp compound if they are performing duties in connection with their work assignment which is outside the confines of the main compound.

41. Except for employment and other approved program activities (i.e. seeking employment, meals served through a local restaurant and attending religious services), residents in a CCC are not permitted to leave the center without prior approval of the community corrections manager.

42. Whether an inmate may be permitted to leave the CCC for employment or other approved program activities depends upon whether the inmate is eligible for work release and whether the CCC offers the program activities on-site.

43. Inmates at the Catholic Services CCC who are not on work release may not seek employment off-site.

44. Federal inmates housed in the following facilities who are not on work release may not seek employment off-site: Cumberland County Prison; Lackawanna County Prison; Montour County Jail; Snyder County Jail; Northumberland County Prison; and York County Prison (no work release).

45. Federal inmates at the Lycoming County Work Release Center are all on work release status and may seek employment off-site.

46. Federal inmates at the Lebanon County Prison who are not on work release are not permitted to seek employment off-site; however, if they have been in the institution for more than three months and have completed 75% of their sentence, they may earn a monthly weekend pass. Inmates on work release may earn an additional one hour per week toward a home visitation pass.

*RELIGIOUS SERVICES:*

47. Inmates at FPC–Allenwood are permitted to attend religious services within the physical confines of the institution.

48. Religious services are provided on-site at the following among the listed facilities, and inmates are not permitted to attend them off-site: Cumberland County Prison; Lebanon County Prison; Montour County Prison; Snyder County Prison; and the York County Prison.

49. Religious services are available off-site at the following among the listed facilities: Catholic Services CCC; Lycoming County Prison Work Release Center; and the Lackawanna County Prison.

50. Information as to whether religious services are provided on- or off-site at the Northumberland County Prison for inmates housed there on contracts with the BOP was unavailable.

*MEALS:*

51. Preparation of meals at FPC–Allenwood occurs within the physical confines of the institution.

52. Except for inmates who are on work release status, preparation of meals occurs on-site at the following facilities, and inmates are not permitted to have meals off-site: Cumberland County Prison; Lycoming County Prison; Lackawanna County Prison; Lebanon County Prison; Montour County Jail; Northumberland County Prison; Snyder County Prison; and the York County Prison.

53. Preparation of meals occurs on-site at the Catholic Services CCC in Scranton.

54. Consumption of meals occurs within the physical confines of FPC–Allenwood.

55. Consumption of meals occurs on-site at all of the listed facilities, except for Catholic Services CCC, at which consumption of meals occurs both on- and off-site.

56. Expenses for meals at the FPC–Allenwood are borne by the United States.

57. Expenses for meals at the listed facilities are included in the contract price negotiated between the BOP and the contractors except for the Catholic Services CCC, where

the inmate contributes 25% of the inmate's earnings for the cost of meals and the Lackawanna County Prison work release section where the resident bears the costs of meals.

*LOCATION OF INSTITUTIONS:*

58. Minimum security federal prison camps, such as FPC–Allenwood, are located in both metropolitan and non-metropolitan areas.

59. CCC's are located generally in metropolitan areas, but may also be located in non-metropolitan areas.

*MEDICAL AND DENTAL CARE:*

60. Medical and dental care are provided to inmates in minimum security federal prison camps, such as FPC–Allenwood, free of charge and thus are borne by the United States.

61. Medical and dental expenses are borne by the United States at the following listed facilities: Northumberland County Prison; Snyder County Prison; and York County Prison.

62. Medical and dental expenses are borne by both the United States and the inmate at the following listed facilities: Cumberland County Prison; Lycoming County Work Release Center; Lebanon County Prison; and the Montour County Jail.

63. Dental and medical expenses are borne by Lackawanna County Prison for inmates who are not on work release and are borne by the inmate for inmates who are on work release.

64. Medical and dental care is generally provided to inmates at FPC–Allenwood within the confines of the institution. Depending on the nature of the physical problem, medical services may be provided off-site.

65. Inmates at FPC–Allenwood with "out" custody classification may be granted a furlough for obtaining local medical treatment not otherwise available at the institution. The local medical treatment ordinarily will not exceed one day.

66. Medical and dental services are performed both on- and off-site depending upon the nature of the physical problem in the following listed facilities: Cumberland County Prison; Lycoming County Work Release Center; Lebanon County Prison; Northumberland County Prison; and the York County Prison.

67. Medical and dental services are performed off-site at the following listed facilities: Catholic Services CCC; Lackawanna County Prison; and the Montour County Jail.

68. Inmates at both FPC–Allenwood and the listed facilities are subject to random drug surveillance.

*STAFF/INMATE RATIO:*

69. The staff/inmate ratio for minimum security federal prison camps, such as FPC–Allenwood, are established by the BOP at its Central Office in Washington, D.C., and are applied to all minimum security federal institutions nationwide.

70. The staff/inmate ratios at contract facilities vary from center to center.

71. The inmate/staff ratio at FPC–Allenwood is approximately four to one.

72. The ratio of inmates to staff at the listed facilities are set forth below:

| | |
|---|---|
| Catholic Services Community Corrections Centers: | 11 to 1 |
| Cumberland County Prison: | 2 to 1 |
| Lycoming County Work Release Center: | 18 to 1 |
| Lackawanna County Prison | 5½ to 1 |
| Lebanon County Prison | 20 to 1 |
| Montour County Jail | 2 to 1 |
| Northumberland County Prison | 4 to 1 |
| Snyder County Prison | 3 to 1 |
| York County Prison | 7 to 1 |

*TELEPHONE PRIVILEGES:*

73. At FPC–Allenwood, inmate access to telephones is controlled, and all inmate telephone calls, with the exception of legal calls, are subject to monitoring.

74. Telephone calls are not monitored at the Catholic Services CCC.

75. In some of the listed facilities, telephone privileges are limited between certain hours each day and inmates may use phones only on a collect-call basis.

*USE OF PHYSICAL FORCE AND RE-CAPTURE:*

76. At FPC–Allenwood, staff may use "appropriate physical force" to prevent an escape.

77. The following listed facilities authorize the use of appropriate physical force to prevent an escape: Cumberland County Prison; Lackawanna County Prison; Lebanon County Prison; Montour County Jail; Northumberland County Prison; Snyder County Prison; and the York County Prison.

78. The following listed facilities do not use force to prevent an escape: Catholic Services CCC and the Lycoming County Work Release Center.

79. At FPC–Allenwood, the warden may authorize the use of firearms to prevent an escape.

80. No evidence was presented that firearms have ever been utilized at FPC–Allenwood to prevent an escape.

81. The following listed facilities may use deadly force to prevent an escape: Cumberland County Prison; Lackawanna County Prison for inmates who are not in the work release program; Lebanon County Prison; Montour County Prison; and the York County Prison.

82. The following listed facilities may not use deadly force to prevent an escape: Catholic Services CCC; Lycoming County Work Release Center; Northumberland County Prison; and the Snyder County Prison.

83. In the event of an escape from FPC–Allenwood, staff may be assigned to "escape posts" and patrol outside the prison camp in an attempt to locate the escaped inmate as soon as possible.

84. When an inmate escapes from a CCC, the United States Marshal is notified. It is within the jurisdiction of the United States Marshal's Service to locate the inmate, including patrolling the immediate vicinity in an attempt to locate the escaped inmate as well as notifying local authorities.

85. Staff at the following listed facilities may recapture an escapee outside of the facility's compound: Cumberland County Prison; Lackawanna County Prison; Leba-non County Prison; Montour County Jail; Snyder County Jail, where they also must call for assistance; and York County Prison.

86. Staff at the following listed facilities may not recapture an escapee outside the facility: Catholic Services CCC; Lycoming County Work Release Center; and Northumberland County Prison.

87. Staff at FPC–Allenwood may recapture an escapee outside the confines of the facility compound.

*DISCIPLINE:*

88. An inmate at FPC–Allenwood may be transferred to a low security facility or a county jail if a disciplinary infraction of serious magnitude is committed by that inmate.

89. CCC's must comply with the BOP prescribed policy and procedure for inmate discipline, and no deviation from this policy will be permitted.

90. Where it is determined that a disciplinary transfer from a CCC is necessary, the community corrections manager may approve an inmate's transfer to a local jail or federal institution. The institution to which the inmate will be returned depends upon its location and proximity to other federal institutions.

*LENGTH OF SENTENCE:*

91. The average length of sentence at FPC–Allenwood is two and one-half (2½) years, and the maximum sentence to be served by an inmate at FPC–Allenwood is ten (10) years.

92. Most inmates in the community corrections component of a contract facility are also committed to the custody of the United States Attorney General.

93. The maximum unexpired term for inmates at listed facilities are as follows:

| | |
|---|---|
| Catholic Services Community Corrections Center | 1 year |
| Cumberland County Prison | 1 year |
| Lycoming County Work Release Center | 1 year |
| Lackawanna County Prison | 1 year |
| Snyder County Prison | 6 months |
| York County Prison | 5 years |

*RECREATIONAL FACILITIES:*

94. Inmates at FPC–Allenwood are required to use the recreational facilities provided at the institution and are not permitted to leave the physical confines of the camp for exercise or recreation.

95. Recreational facilities are provided at the following listed facilities on-site, and inmates may not leave the physical confines of the institutions for recreation: Cumberland County Prison; Lycoming County Work Release Center; Montour County Jail; Northumberland County Prison; Snyder County Prison; and York County Prison.

96. Recreational facilities are not provided on-site at the Catholic Services CCC.

97. Recreational facilities are provided both on- and off-site at the following listed facilities: Lackawanna County Prison and the Lebanon County Prison.

98. Only if a CCC does not have in-house recreational capabilities may residents in the community corrections component sign up for recreation for up to one hour per day to the immediate vicinity of the facility and then solely for the purpose of exercise/recreational activity.

*HOME CONFINEMENT AND FURLOUGHS:*

99. Inmates at FPC–Allenwood are eligible for home confinement; however, it is unavailable.

100. Inmates in the community corrections component of a CCC are not ordinarily eligible for furloughs, home confinement, or overnight or weekend passes.

101. Inmates in the community corrections component of a CCC are not permitted to leave the CCC without prior approval of the community corrections manager.

102. Inmates in the community corrections component of a CCC are not ordinarily permitted to be absent from the center for social purposes.

103. Inmates at the following listed facilities may be eligible for home confinement with a court order: Catholic Services CCC and the Cumberland County Prison.

104. Community corrections inmates at the Lebanon County Prison may be eligible for home confinement only if authorized by the BOP.

105. Community corrections inmates at the following listed facilities are not eligible for home confinement: Lycoming County Work Release Center; Lackawanna County Prison; Montour County Jail; Snyder County Prison; and York County Prison.

106. Inmates at FPC–Allenwood with 24 months or less remaining to be served may be eligible for day furloughs within a 50–100 mile radius of Allenwood.

107. Inmates at FPC–Allenwood with 18 months or less remaining to be served may be eligible for overnight furloughs within a 50–100 mile radius of Allenwood.

108. Inmates at FPC–Allenwood with 12 months or less remaining to be served may be eligible for furloughs outside the 50–100 mile radius of FPC–Allenwood.

109. The types of furloughs available for inmates at FPC–Allenwood are social furloughs, religious furloughs, medical furloughs, emergency/family crisis furloughs, legal furloughs, and transfer furloughs from FPC–Allenwood to a CCC or community treatment center.

110. Inmates at FPC–Allenwood may leave the facility for the funeral of a family member or for a family emergency with supervision.

111. Inmates at the Northumberland County Prison may leave the facilities for a funeral of a family member or a family emergency if ordered by the court.

112. Inmates may leave the facility for a funeral of a family member or family emergency with proof of emergency or death of a family member at the Catholic Services CCC.

113. Inmates may leave the facility for the funeral of a family member or family emergency if authorized by the BOP at the following listed facilities: Cumberland County Prison; Montour County Jail; and York County Jail (if the court also provides an order).

114. Inmates at the Lycoming County Work Release Center may receive permis-

sion from the BOP to leave the facility for the funeral of a family member or family emergency depending upon the sentence they are serving.

115. Inmates at the Lebanon County Prison may receive permission from the BOP to leave the facility for the funeral of a family member or for a family emergency if they are on work release and, in general, people who are on work release are not in the community corrections component but in the pre-release component.

116. Inmates at the Lackawanna County Prison may leave the facility for the funeral of a family member or for a family emergency without a court order or prior BOP approval.

*FIREARMS TRAINING AND MAINTENANCE OF AN ARMORY:*

117. FPC–Allenwood maintains an armory which contains various weapons, including shotguns, .38 caliber handguns, M–16 rifles, and two gas guns. Staff at FPC–Allenwood are trained in the use of firearms and are permitted to use firearms.

118. The following listed facilities maintain an armory: Cumberland County Prison; Lebanon County Prison; Montour County Jail; and the York County Prison.

119. The following listed facilities do not maintain an armory: Catholic Services Community Corrections Center; Lycoming County Work Release Center; Lackawanna County Prison; Northumberland County Prison; and Snyder County Prison.

120. Staff at the following listed facilities are trained in the use of firearms: Cumberland County Prison; Lebanon County Prison; Montour County Jail; Northumberland County Prison; Snyder County Prison; and York County Prison.

121. Staff at the following listed facilities are not trained in the use of firearms: Catholic Services CCC; Lycoming County Work Release Center; and Lackawanna County Prison.

122. Staff at FPC–Allenwood are authorized to use force, including physical force, in a variety of situations such as preventing physical altercations between inmates, stop-

ping inmate disturbances, and preventing escapes.

123. Staff at most of the listed facilities are similarly authorized to use force, including physical force, in a variety of situations such as preventing physical altercations between inmates, stopping inmate disturbances, and preventing escapes.

124. Staff at the Catholic Services CCC may use appropriate physical force only for self-defense, defense of another, and to prevent loss or destruction of property.

*LAUNDRY:*

125. The costs of laundering a resident's belongings in a CCC are the responsibility of the community corrections contractor.

*COUNTS:*

126. Procedures for locating and verifying the whereabouts of all residents at CCC's must be maintained at all times.

127. Contract staff at CCC's are required to verify an inmate's employment once during the first seven days and through telephonic contact with the employer at least once monthly thereafter.

128. There are five formal counts per day at FPC–Allenwood: 3:00 a.m., 5:00 a.m., 4:00 p.m., 9:00 p.m., and midnight.

129. Inmates at listed facilities are counted in accordance with the regular counting regulations at the institutions.

130. Inmates of Catholic Services CCC in Scranton are observed by staff on an hourly basis when they are not on work-release.

131. Inmates at the Cumberland County Prison are observed by staff hourly.

132. The following facilities have the listed number of counts per day:

| Facility | Counts/Day |
|---|---|
| Lycoming County Work Release Center | 6 |
| Lackawanna County Prison | 10 |
| Lebanon County Prison | 9 |
| Montour County Jail | 3–4 counts/shift |
| Northumberland County Prison | Not Available |
| Snyder County Prison | 3, plus "spot checks" |
| York County Prison | 4 |

*TRAINING OF STAFF:*

133. Training of staff is mandatory at FPC–Allenwood.

134. Training of staff is mandatory at all of the listed facilities except at the Lackawanna County Jail.

135. The BOP provides training for staff at FPC–Allenwood and at the Catholic Services CCC, but does not provide training for county jails and prisons.

*GEIGER CORRECTION CENTER IN SPOKANE, WASHINGTON:*

136. The Geiger Correction Center in Spokane, Washington, is a contract facility with the BOP, but no evidence was offered to show that its contract includes the Statement of Work, Community Corrections Centers.

137. Inmates at the Geiger Correction Center are assigned to work details within the physical confines of the institution. At times, inmates may be assigned to cut grass beyond the perimeter fence.

138. Inmates at Geiger Correction Center receive psychiatric counselling within the physical confines of the institution.

139. Inmates at Geiger Correction Center are permitted to attend religious services within the physical confines of the institution.

140. Inmates at the Geiger Correction Center are provided meals within the physical confines of the institution, and the consumption of all meals must occur within the physical confines of the institution.

141. Expenses for meals are included in the per diem paid by the BOP to the correction center and thus are borne by the government.

142. Medical and dental expenses are borne by the BOP.

143. Medical care is provided to inmates at the Geiger Correction Center depending upon the medical care needed.

144. All dental care is provided off-site, but the expenses are borne by the BOP.

145. Staff at the Geiger Correction Center receive mandatory training.

146. The ratio of inmates to staff at the Geiger Correction Center is three-to-one.

147. Inmates at the Geiger Correction Center are eligible for home confinement with approval of the BOP.

148. Inmates at the Geiger Correction Center may make collect calls from the center. Inmate telephone calls are not monitored.

149. The maximum sentence of an inmate at the Geiger Correction Center is five years.

150. At the Geiger Correction Center in Washington there are 3–5 counts per day.

151. Staff are permitted to use force to prevent an escape at the Geiger Correction Center.

152. An inmate may leave the Geiger Correction Center for a funeral or family emergency with approval.

153. Inmates may not leave the Geiger Correction Center for employment, religious services, or meals.

154. Staff at the Geiger Correction Center may apprehend an escapee outside the confines of the facility. In general, staff of the Geiger Correction Center would search for the escapee and then notify the authorities.

155. Inmates at the Geiger Correction Center who are there pursuant to a federal contract and create a disciplinary problem would be transferred to the county jail and the BOP would be notified.

156. All recreation at the Geiger Correction Center occurs within the confines of the institution.

157. The Geiger Correction Center does not maintain an armory on-site and staff are not trained in the use of firearms.

*METHOD OF ESCAPE AND SAFETY CONSEQUENCES:*

158. Inmates who escape from FPC–Allenwood can escape at all hours by walking away from the institution, and are in a position to do so because FPC–Allenwood is not locked down.

159. Although a non-violent walk-away does not present the level of potential dangers of escape from a secure facility which may require "going over the wall," escape from FPC–Allenwood involves a threat to people or property.

**1338**

160. Inmates who escape from CCC's, which are not secure or locked down, may escape in the same fashion as an escape from FPC–Allenwood, that is, a walk-away.

161. Inmates who are housed in facilities which are prisons or jail-type facilities are not in a position simply to walk-away in a non-violent manner because those facilities are generally locked down in some fashion.

162. Inmates in jail-type facilities but who are on work-release status could walk away in the same manner as from FPC–Allenwood, that is, a non-violent walk-away from the employment or work site.

*CASE SPECIFIC TO HILLSTROM:*

163. Hillstrom's escape from FPC–Allenwood was from non-secure custody as defined by USSG § 2P1.1, Commentary, Application Note 1.

164. At the time of his escape, Hillstrom was assigned the task of mowing the field outside the compound of the camp.

165. Hillstrom was given the key to a tractor at about 7:30 a.m. and directed to mow the fields. He was not monitored or supervised at all times during the day. He was not officially detected missing until the 4:00 p.m. count.

166. Among Hillstrom's duties on his job outside the perimeter fence of FPC–Allenwood was to take debris up to the Lycoming County Landfill which is located on the government reservation at Allenwood and which leases its land from the government. In so doing, he got in line with all of the other people taking debris up to the landfill and took instructions from the landfill master. In addition, while waiting in line, he had an opportunity to talk with other drivers.

167. Among Hillstrom's duties while working at FPC–Allenwood was to get rocks on the road near the landfill with a backhoe. Hillstrom understood that the rocks would be used to build a rock fence.

168. On several occasions, Hillstrom was directed to drive his backhoe through the reservation to the captain's house on Route 44 to pick up garbage.

169. Hillstrom was directed to take rocks to the Associate Warden's and Warden's homes on the government reservation, outside the front gate of FPC–Allenwood.

170. When Hillstrom was working outside the compound of FPC–Allenwood, inmates from FPC–Allenwood would bring him his lunch, which required the other inmate to go outside the compound.

171. Because one of the fields mowed by Hillstrom was next to a golf course, Hillstrom often picked up and tossed golf balls back to individuals who had hit them over the fence.

172. No actual violence took place when Hillstrom walked away from his work detail.

173. Hillstrom's escape conduct or walk away from FPC–Allenwood was conduct which could be identical to an escape or walk away from a CCC.

174. At the time of Hillstrom's walk-away, he was not under immediate supervision.

175. Prison authorities later found Hillstrom's tractor abandoned in nearby woods.

176. FPC–Allenwood is unpatrolled during the work day—from 7:30 a.m. until 4:00 p.m.

177. There are no formal counts of inmates during the work day. There are two census counts of inmates during the work day.

178. Prisoners at FPC–Allenwood may walk away from the dormitories as easily as from work details.

179. In its categorization of prohibited acts, the BOP categorizes escapes into two levels of severity. The first level of severity of escape is escape from escort, a secure institution, or a non-secure institution using violence. The second level of severity is escape without violence from an unescorted community program, a non-secure institution (such as FPC–Allenwood), or from outside a secure institution.

180. In drafting the sentencing guidelines, the United States Sentencing Commission considered and reviewed the Rules and Regulations of the United States Parole Commission which provide for recision of a parole date for escape behavior. The

amount of time by which a parole date is retarded depends upon the type of escape. The parole rules and regulations define escape from non-secure custody as follows:

Non-secure custody refers to custody with no significant physical restraint [e.g., walkaway from a work detail outside the security perimeter of an institution; failure to return to any institution from a pass or unescorted furlough; or escape by stealth from an institution with no physical perimeter barrier (**usually a camp or community treatment center**).

181. In designating prisoners and determining the level of security in which they should be housed, the BOP attaches a higher security level to inmates who have escaped from secure or closed institutions and a lower security level to inmates who have escaped from non-secure or open institutions.

182. The escape "conduct" of a prisoner who escapes from FPC–Allenwood and a non-secure CCC, community treatment center, halfway house, or from a work release site may be similar, i.e. a walk-away in a non-violent manner; however, the significance and consequences of the escape differ, in that an escape from FPC–Allenwood is generally an escape from a longer sentence and involves a risk of violence.

## V. CONCLUSIONS OF LAW

■ 1. When he escaped from FPC–Allenwood, defendant Hillstrom was in non-secure custody.

■ 2. FPC–Allenwood is not similar to the community corrections component of a CCC nor to CCC's in general.

3. FPC–Allenwood is not a "similar facility" for purposes of USSG § 2P1.1(b)(3).

■ 4. Amendment No. 341 to the Sentencing Guidelines which reduces the offense level by four (4) levels for inmates who escape from non-secure custody which is similar to a community corrections center was passed to "provide greater differentiation in the guideline offense levels for the various types of conduct covered by this guideline." U.S.S.G. Appendix C, par. 341.

5. Because FPC–Allenwood is not a facility similar to a CCC, Hillstrom is not entitled to a four-level reduction of the offense level under § 2P1.1(b)(3).

6. The base offense level is 13. The adjusted offense level is 11.

7. Hillstrom's criminal history category is IV.

8. The guideline imprisonment range is 18–24 months.

## VI. COMPARISON

### A. What Is a Community Corrections Center?

■ Obviously, before a comparison can be made between a CCC and any other facility, it is necessary to determine the nature of a CCC. In this regard, we rely heavily upon the testimony of Edward Hughes, the Community Corrections Manager of the BOP office in Philadelphia.

According to Hughes, a CCC is a specific type of facility, run by a state or private entity with whom the BOP contracts. The performance expected of the contractor is set forth in the Statement of Work, Community Corrections Center, dated February, 1989 (Defendant's Exhibit 3). Other entities contract with the BOP to house inmates in facilities similar to a CCC, but *only those facilities run pursuant to a contract incorporating this Statement of Work are actually CCC's.* The only facility in the Middle District of Pennsylvania for which there is such a contract is the Catholic Services Community Corrections Center in Scranton, Luzerne County.

Hillstrom contends that we should compare FPC–Allenwood to all of the facilities listed in Finding of Fact No. 12. Eight of those facilities, however, are not CCC's; instead, they have wholly separate contracts with the BOP, which include a community corrections component. While it may be that, because of the community corrections component, some or all of these facilities are similar in some respects to a CCC, USSG § 2P1.1(b)(3) calls for a four-point reduction when the facility in question, i.e. that from which the defendant has escaped, is similar

to a CCC. Hillstrom's line of reasoning leads to the conclusion that FPC–Allenwood is similar to facilities which are similar to a CCC, an unjustified broadening of the inquiry. We will therefore confine our comparison to the Catholic Services CCC, or a "hypothetical" CCC, the picture of which is painted by Defendant's Exhibit 3.

### B. Conditions of Confinement in a Community Corrections Center

A CCC is a facility owned and operated by an entity other than the BOP which houses non-violent inmates committed for short terms. They generally are located in an urban setting, but that setting is not exclusive. The only CCC in the Middle District of Pennsylvania, the Catholic Services CCC, is located in the City of Scranton. The Catholic Services CCC, like all facilities designated as "community corrections centers" by the BOP, is contractually obligated to the BOP to operate its facility consistently with the rules and guidelines set forth in the Statement of Work, Community Corrections Center, issued by the BOP.

■■■ The Statement of Work (hereinafter cited as "SW") shows that the CCC consists of two components: a community corrections component and a pre-release component.[5] Community corrections inmates are generally confined to the center absent work-release or court-ordered community service; also, they generally are not eligible for passes or furloughs. SW at 22, 31, 32. With prior approval of the community corrections manager ("CCM"), however, passes, furloughs, and other absences from the facility may be permissible under certain, limited circumstances. SW at 22.

There are two types of inmates in a CCC: an inmate who has served a portion of his/her sentence and is completing the sentence; and a "direct court commitment," a non-violent offender recommended by the court. SW at 2. Inmates have a confinement designation

of "community." Undisputed Finding of Fact No. 35.

Personnel at a CCC are required to be trained, and there must be staff awake and on the premises at all times. SW at 8. Written personnel policies and job descriptions are required. SW at 8, 9.

Regarding safety, the Statement of Work states in pertinent part:

The use of physical force shall be resorted to only in instances of justifiable self-defense [or] the prevention of loss or damage to property, and to prevent a resident from self-inflicted harm.

Safety of residents and staff shall be given highest priority, however, only the degree of force necessary to control the situation is allowed; excessive force is prohibited. Any instance where use of physical force is required shall be reported immediately to the CCM. The contractor shall furnish a written report within 24 hours.

The use or possession of lethal weapons in the contract facility shall be prohibited.

SW at 6–7.

The Statement of Work also provides for the location and condition of the physical facilities of the center. SW at 13–15. Residents are expected to seek gainful employment, SW at 25, although the Catholic Services CCC does not allow non-work-release inmates to seek employment off-site. Undisputed Finding of Fact No. 44. Residents are subject to random testing for drugs, SW at 27, and alcohol. SW at 29. Inmates in the community corrections component of the CCC are not eligible for home confinement absent a court order. SW at 35. Operation of a motor vehicle and marriage while confined require prior approval. SW at 35–36. Residents are permitted to receive visitors in a designated area. SW at 36.

Other conditions of confinement at the Catholic Services CCC are summarized in the Findings of Fact, *supra*, and in the table following this memorandum.

---

5. While the opinion of the Court of Appeals focuses on the community corrections component, it does not preclude consideration of the pre-release component in the comparison with FPC–Allenwood. In fact, the mere existence of the pre-release component reflects a considerable difference between a CCC and FPC–Allenwood. The remainder of this memorandum, however, will focus on the community corrections component of a CCC.

## C. Conditions of Confinement at FPC–Allenwood

FPC–Allenwood is a federal prison camp[6] located in Montgomery, Pennsylvania. Inmates at FPC–Allenwood, which is operated by the BOP, are convicted offenders committed to the custody of the United States Attorney General. Undisputed Finding of Fact No. 1. They are generally non-violent offenders. Undisputed Finding of Fact No. 36. Inmates are housed in dormitory-style housing rather than locked-down, cell-type housing. Undisputed Finding of Fact No. 15. Inmates at FPC–Allenwood receive an initial custody designation of "out," which subsequently may be changed to "community." Undisputed Finding of Fact No. 34.

Most inmates at FPC–Allenwood have job assignments within the camp, though some may be assigned to tasks outside the compound. Undisputed Findings of Fact Nos. 37–41. The work they perform, however, is performed for and supervised by the BOP or prison industries; no evidence was presented that FPC–Allenwood inmates are employed by private employers.

The following activities take place within the confines of the compound at FPC–Allenwood: religious services, Undisputed Finding of Fact No. 53; preparation and consumption of meals, Undisputed Findings of Fact Nos. 57, 60; generally, medical and dental care, Undisputed Finding of Fact No. 70; and recreation and exercise, Undisputed Finding of Fact No. 101.

At FPC–Allenwood, appropriate physical force may be used to prevent an escape, and the warden may authorize the use of firearms in such a situation. Undisputed Findings of Fact Nos. 82, 85. An armory is maintained at FPC–Allenwood, and staff are trained and permitted to carry and use firearms. Undisputed Finding of Fact No. 126. Staff may recapture an escapee outside the camp compound. Undisputed Finding of Fact No. 93.

Other conditions of confinement at FPC–Allenwood are summarized in the Findings of Fact, *supra*, and in the table following this memorandum.

## D. The Geiger Correction Center

According to Hillstrom, the conditions at a facility identified as the Geiger Correction Center are reflective of FPC–Allenwood's similarity to a CCC. Hillstrom contends that Geiger is a CCC, that employees there consider themselves to be similar to a federal prison camp, and that conditions resemble those at FPC–Allenwood.

The problem with this comparison is that, while there was evidence that Geiger is a non-BOP-operated facility, there was no evidence that the contract between the operators of Geiger and the BOP contained the Statement of Work referred to above. In fact, many of the conditions of Geiger which were discussed at the September 16, 1993, hearing and in Hillstrom's proposed findings of fact contradict the conditions at the Catholic Services CCC and the Statement of Work. For example, at Geiger, the BOP pays a per diem for meals, and the BOP pays for medical and dental expenses. Testimony of Larry Crisman (relating what he was told by employees at Geiger). However, inmates at the Catholic Services CCC bear the expenses for meals, medical care, and dental care. Defendant's Exhibit 8.

Moreover, according to the testimony of Edward Hughes, who stated he was familiar with Geiger, it is a county contract facility and is not a CCC. In short, there is no basis for a comparison between FPC–Allenwood and Geiger, since Geiger's status as a CCC was not established, and evidence presented contradicts the contention that Geiger is a CCC.

## E. Contrasting Points

It is clear from a review of the record that there are a number of conditions of incarceration at FPC–Allenwood that contrast with conditions at CCC's generally and the Catholic Services CCC in particular.

 Initially, it must be remembered that a fundamental difference exists from the

---

**6.** The official title of the camp is Federal Prison Camp, Allenwood, to be distinguished from Low Security Correctional Institution (LSCI) Allenwood. *See* 28 C.F.R. § 503.2(c), (d).

**1342**

outset of this comparison in that one of the components of a CCC, the pre-release component, is not "punitive," but is intended to facilitate the inmate's re-introduction into society. *See* Note 3, *supra.*

The opinion of the Third Circuit emphasized the policy consideration underlying § 2P1.1(b)(3) that escapees from more secure facilities be punished more severely. *Hillstrom, supra,* 988 F.2d at 452–453. A number of points developed within the record indicate a divergence in the safety ramifications of an escape from the two types of facilities in question.

In contrast to staff at a CCC, the staff at FPC–Allenwood is trained in the use of firearms and is authorized to use firearms. The warden at FPC–Allenwood may authorize the use of deadly force to prevent an escape. While no evidence was offered to show that such force has ever been used, the potential certainly exists. Moreover, physical force not amounting to deadly force may be used, while staff at a CCC is restricted to using physical force only for self-defense, defense of others, and defense of property. Again, there is a potential for violence at FPC–Allenwood which does not exist at a CCC.

■■■ Hillstrom argues that inmates at either institution may walk away in a non-violent manner. The obvious answer to this contention is that the lack of violence is a result of the manner of a successful escape, and not the nature of the institution. If an inmate from a maximum security penitentiary were detailed to work outside of prison walls, he also could walk away from his task. In Hillstrom's example, it is the manner of the escape that is non-violent, but the manner of the escape is only part of the safety ramifications of an escape. Once the escape is discovered, there are ramifications in the manner in which prison officials will react.

Once an escape is detected at FPC–Allenwood, a foot patrol of two individuals would attempt to follow the path of the inmate, and three mobile posts would check highway rest stops, etc. Testimony of Dennis Faulk. Again, force may be used to prevent an escape or to apprehend an escapee. At a CCC, staff may not apprehend the inmate, nor may force be used to prevent an escape.

Certain services are provided by the BOP at FPC–Allenwood, such as most medical and dental care, laundry, recreation, etc., which indicates that, despite the lack of bars, cells, and electric fences, FPC–Allenwood has many of the characteristics of a traditional prison. Moreover, inmates are not permitted to leave the facility. Those inmates who are employed generally work within the confines of the camp or in its immediate vicinity. The work done by these inmates is related to their incarceration or the camp, such as maintaining the grounds of the camp or the larger reservation, or assisting with the preparation of the new BOP facilities in the vicinity. The inmates are not released to work for private entities.

At a CCC, inmates may be permitted to leave the facility as part of court-ordered work release. The work they do is for entities other than the BOP or the private contractor. Medical and dental care are provided off-site, and the inmates at the Catholic Services CCC bear the cost.

Another indication of FPC–Allenwood's more restrictive atmosphere is that all non-legal telephone calls are monitored, while calls at a CCC are not monitored.

The maximum length of a sentence for an inmate at FPC–Allenwood is ten years, and the average sentence is two and one-half years, while the maximum sentence to be served by an inmate at the Catholic Services CCC is one year. The import of an escape varies, then, according to the facility, since an escape from FPC–Allenwood is an escape from a longer period of incarceration. In other words, an inmate at FPC–Allenwood is "walking away" from greater consequences for past behavior.

### F. Hillstrom's Pro Se Arguments

In Hillstrom's *pro se* "objection" to the September 16, 1993, hearing, he set forth several points he "would argue" if permitted. Initially, he contends that county jails and prisons with community corrections components would be similar facilities for purposes of USSG § 2P1.1(b)(3), and that they are similar to FPC–Allenwood "even though they

are not semantically listed as CCC's by the B.O.P."

First, as discussed above, the designation of CCC is not "semantic." It is a specific designation given because the BOP has entered into a specific agreement with the contractor. Second, also discussed above, FPC–Allenwood's similarity to county jails and prisons is not indicative of any similarity between FPC–Allenwood and a CCC. Third, though we need not reach this issue, it is not at all clear that the county jails and prisons with community corrections components are similar to a CCC, since the security and safety measures vary significantly. In fact, FPC–Allenwood's similarity to a county jail or prison underscores its difference from a CCC.

Hillstrom next contends that the Third Circuit's opinion should be read as requiring a case-by-case analysis of the risk of violence for each escape. His example is that of an inmate at FPC–Allenwood who escapes while on furlough. However, neither the Third Circuit's opinion nor USSG § 2P1.1(b)(3) can be so read. Certainly, a walk-away while on furlough generally does not involve violence, and one of the purposes of the Sentencing Guidelines is to punish similar conduct similarly. However, Hillstrom's interpretation would emasculate the language of USSG § 2P1.1(b)(3) beyond recognition, since the section calls for a four-point reduction if the subject facility is similar to a CCC, not if an individual escapee manages to avoid violence. In fact, under Hillstrom's line of reasoning, the escapee would be rewarded for accomplishing his escape.

Finally, Hillstrom contends that the court should consider the inverse of "the 'similar facility' coin": that an escape from a nonsecure institution such as FPC–Allenwood does not involve the level of risk involved in an escape from an institution such as the United States Penitentiary at Lewisburg, Pennsylvania. To expand upon Hillstrom's coin analogy, because a nickel is not similar to a quarter does not make it similar to a penny. There is a higher degree of risk in an escape from FPC–Allenwood than from the Catholic Services CCC; this risk is not diminished by the fact that there is an even greater threat of violence involved in an escape from USP–Lewisburg.

Hillstrom's proposed testimony to be presented at a "supplemental hearing" does not change our conclusion, thus reinforcing our decision to deny his "objection."

\* \* \*

Appended to this memorandum is a table, part of that provided to the court as Defendant's Exhibit 8, which reflects even more differences between FPC–Allenwood and a CCC. Based upon the foregoing and the appended table, we conclude that FPC–Allenwood is not a "similar facility" within the meaning of USSG § 2P1.1(b)(3). An appropriate order shall issue.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Defendant Carl Hillstrom's motion (record document no. 46) to proceed *pro se* and for a supplemental hearing is denied as untimely.

2. Defendant's request for extension of time (record document no. 55) is denied.

3. Defendant's objection to the pre-sentence report is overruled. The Federal Prison Camp at Allenwood is not similar to a community corrections center, so that the 4-point reduction in offense level provided in Section 2P1.1(b)(3) of the Sentencing Guidelines does not apply.

3. The sentence imposed by this court on April 29, 1992 and the judgment entered thereon April 30, 1992 are reinstated, without change.